# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

JASON O. WILLIAMS,        )
                             )
        Petitioner,      )
                             )
vs.                       )     CIVIL ACTION NO. 04-0681-WS-C
                             )
DONAL CAMPBELL,       )
                             )
        Respondent.    )

## ORDER

This matter is before the Court on the petitioner's amended petition for a writ of habeas corpus. (Doc. 11). The parties have filed briefs in support of their respective positions, (Docs. 11, 16, 20), and the petition is ripe for resolution. After carefully considering the foregoing and all other relevant materials in the file, the Court concludes that all claims advanced in the petition are due to be denied, with the exception of the petitioner's *Atkins* claim, the resolution of which must await further developments.

## BACKGROUND

On the morning of February 15, 1992, the petitioner killed Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber. He was convicted on two counts of capital murder: one for murder during a robbery, and the other for murder of two or more persons pursuant to one scheme or course of conduct.[1] The trial judge imposed the death penalty after the jury, by a vote of 10-2, recommended that sanction. The Alabama Court of Criminal Appeals affirmed the conviction and sentence,[2] and the Alabama Supreme

---

[1]He was also convicted of the attempted murder of Jeffrey Carr and Brad Barber.

[2]*Williams v. State*, 710 So. 2d 1276 (Ala. Crim. App. 1996).

Court affirmed the lower court.[3]  The Supreme Court thereafter denied a petition for writ of certiorari,[4] concluding the petitioner's direct appeals.

The petitioner then filed a petition and an amended petition under Alabama Rule of Criminal Procedure 32.  (Vol. VIII, P-12, -13).  The trial court conducted an evidentiary hearing, at which the petitioner presented two experts and four lay witnesses but not his trial counsel.  (*Id*., P-15).  The trial court dismissed certain claims as procedurally barred and rejected the remainder on the merits.  (*Id*.,  P-17).  The Court of Criminal Appeals affirmed, (Vol. IX, P-26), and the Alabama Supreme Court denied certiorari, whereupon the petitioner timely filed his federal petition.  (Doc. 16 at 3).

The petitioner at trial did not deny killing the four victims, but he argued that he was temporarily insane at the time and that voluntary intoxication deprived him of the mental state required to commit murder.

## TRIAL EVIDENCE

The petitioner was married to Sandra Ellzey for about ten months, divorcing in 1991.  As of late January 1992, the petitioner was living with Ellzey, but she required him to move out because of his drug use.  Gerald and Clair Paravicini, who had known the petitioner for several years, allowed him to move in with them and Jeffrey Carr, Clair's minor son.  (Vol. II, P-1 at R-238, 350, 441-42, 509).[5]

On the evening of February 14, after finishing his day's work as a carpet installer, the petitioner met Ellzey for their first evening together since he had moved out, an event he had arranged.  By around 11:00 p.m., she was ready to go home, but he wanted to "party" some more, so he had Ellzey drop him off at another bar.  He was to call her for a

---

[3]*Ex parte Williams,* 710 So. 2d 1350 (Ala. 1997).

[4]*Williams v. Alabama*, 524 U.S. 929 (1998).

[5]The Court utilizes a citation system similar to that adopted by the petitioner. (Doc. 11 at 2 n.1).

ride home, but he never did so.  He got a ride to let him out at a store almost half a mile from the Paravicini's trailer, and he walked from there.  (Vol. II, P-1 at R-442-44, 485-86, 488-89, 492, 509).

The petitioner knocked on Jeffrey's window, and the youth let him in, around 6:00 a.m.[6]  In response to a question about his plans for the day, the petitioner told Jeffrey that he had a side job to do.  The petitioner appeared to be in a normal mood, and he acted no differently towards Jeffrey than he ever had.  The petitioner did not appear to be drunk, because he did not display his characteristic tilt of the head and slurring of speech.  The petitioner used a cordless telephone to call Ellzey, who was "angry" and "upset" at the petitioner because she had wanted him to come back to her house, and she was "fussing" at him because he hadn't.  She told the petitioner that she felt used and that his treatment of her told her they had problems. Throughout the call, the petitioner appeared to Ellzey to be calm, quiet, normal.  Although she had observed him intoxicated on many occasions, there was nothing in his demeanor that suggested to her that he was under the influence of drugs or alcohol.  (Vol. II, P-1 at R-252-54, 262, 264, 443-44, 462, 466-67).

Jeffrey watched the petitioner pacing and heard him say something about "wouldn't sit up front in the front seat with her."  With Ellzey still on the line, the petitioner walked through the Paravicinis' bedroom, where Clair lay in bed.  He went into the bathroom, Clair heard a clicking noise, and the petitioner exited the bathroom holding a 22-caliber rifle the Paravicinis kept in their bedroom.  Clair could see and hear the petitioner in the bedroom and dining room, and he acted normal, as he always had. When the petitioner returned to the living room, Gerald grabbed for the rifle, and the petitioner said, "It's okay, I checked it, it's safe."  The petitioner walked behind Jeffrey, out of his sight, but Jeffrey heard him say, "What's wrong, Sandra, didn't you have a good time last night?" in a "kind of upset voice."  The petitioner then shot Jeffrey in the

---

[6]The witnesses' testimony concerning time is not precisely reconcilable, but all testified that the events took place near 6:00 a.m.

mouth.  Gerald hollered, "No, Jay, don't do it!" and Jeffrey ran out the trailer and to a neighbor's house.  While he was outside running away, the petitioner shot him in the arm. (Vol. II, P-1 at R-239-40, 244-46, 254-56, 262-63).

Clair came out of the bedroom after hearing a second shot.  She saw the petitioner by the pool table with the rifle in his hand, and out the front door she saw Jeffrey running and Gerald standing in the yard.  Gerald told her, "I been shot, get George," and Clair ran to George Evans' house next door.  She mumbled, "Jay shot, Jay shot," and turned to go back to her husband.  Gerald fell by the road, and Clair ran to him.  Gerald was shot in the base of the left neck and in the upper left chest area.  The presence of stippling noted at autopsy indicated the shot to the neck was fired at relatively close range, perhaps within inches and no more than six feet.  (Vol. I, P-1 at Tr. 4-6; Vol. II, P-1 at R-241-42, 246-47, 410, 412, 427).

Evans followed Clair, holding a shotgun.  He looked to his right and saw the petitioner standing in the doorway to the Paravicini trailer no more than 100 feet of open ground away from him, the rifle trained on him. Evans, fully exposed, quickly brought up his shotgun, aimed at the petitioner, and shouted, "Don't do it, Jay."  The petitioner ducked into the doorway, and Evans ran back to his trailer.  Though he was exposed the entire way, the petitioner did not shoot at him.  (Vol. I, P-1 at Tr. 6-8).

On the telephone, Ellzey heard a cracking, popping noise, and the petitioner's telephone dropped.  Shortly thereafter, there was another cracking, popping noise.  It was quiet, then the petitioner picked up the phone again.  She started saying his name, and the phone dropped again, without him saying anything.  (Vol. II, P-1 at 444-46, 467).

Meanwhile, Clair found she couldn't get Gerald up.  She ran back in the trailer for bandages and car keys, where she found the petitioner standing inside.  He waved the rifle around at her and told her to get back and leave him alone or he would kill her.  Clair told him that Gerald was hurt and that the petitioner had to help her with him.  The petitioner responded, "All right, give me the keys, I am going to take Mr. Gerald to the hospital."

-4-

He had her purse in his hand, and when she asked for it in order to look for the keys, he struck her in the face, breaking her jaw. He then left with the rifle and the purse, which contained credit cards, a checkbook, and over $500 in cash. Two spent shell casings were later recovered from the trailer. (Vol. I, P-1 at Tr. 46; Vol. II, P-1 at R-242-43, 246-48, 250, 464-66).

Buford Billedeaua was driving a truck past the Paravicini trailer when he observed Jeffrey and Gerald run out. He stopped his vehicle and saw the petitioner, carrying a black purse, take a shot at Gerald. The petitioner came up to the truck and told Billedeaua he needed the truck, he had an emergency. He looked like he was pilled up on dope or something, his eyes had a funny look about them. Billedeaua exited the vehicle, taking the keys with him, and ran into some nearby woods. Billedeaua heard the petitioner slam the truck door, then slam it again. He heard a shot, and the petitioner told him to pitch the keys. Billedeaua performed an evasive maneuver, and the petitioner shot at him. The petitioner then headed down the road to the Barbers' house, about 100 yards from the Paravicini trailer. (Vol. I, P-1 at Tr. 11-15, 20-21, 37).

Linda Barber was found just inside the front door, shot twice in the head. Her husband Freddie was found nearby, also shot twice in the head. Their son Bryan was found lying in his bed, also shot twice in the head. Each victim showed stippling. (Vol. I, P-1 at Tr. 38-39; Vol II, P-1 at R-417, 419-20, 423).

Brad Barber was asleep in his back bedroom when he was awakened by hollering and screaming. He did not hear anyone asking for keys or saying there was an emergency. He opened his door and saw the petitioner coming down the hall towards him, carrying the rifle and looking real scared. As he came, the petitioner said three or four times, "I'm coming to get you, buddy." Brad closed his door, but the petitioner kicked it in. Brad grabbed the gun, the petitioner shot him in the hand, and the two struggled until Brad got away and ran out the back door, through the woods, and to his sister's house. A total of ten shells were collected from the Barber home. (Vol. I, P-1 at

Tr. 22-28, 31-33; Vol. II, P-1 at R-376-77).

The car keys hung on a rack in the Barbers' kitchen, and Bryan's keys were beside his bed.  The petitioner retrieved the keys from the kitchen, took the Barbers' minivan, and left.  He was apprehended near the Mississippi-Louisiana border on the afternoon of February 16, after he called Ellzey and arranged to surrender.  The petitioner was in possession of the Barbers' minivan, and Clair's purse was in the vehicle.  The rifle was not inside, and the petitioner advised law enforcement officers that he had thrown it off an unknown bridge into the water.  The petitioner also threw Freddie Barber's wallet out of the car, after taking all the money it contained.  (Vol. I, P-1 at Tr. 28-29, 48, 50-51; Vol. II, P-1 at R-289-92, 455-57, 498-99, 573).

There was ample, if inconsistent, evidence concerning the petitioner's consumption of drugs and alcohol prior to the killings.  According to the petitioner's trial testimony in November 2002, he had a few beers with Ellzey, and when she dropped him off at the bar around 11:00 or 11:30 p.m. he drank a "pretty good bit" of dollar beer.   At the bar, he bought three hits of LSD from someone he did not know who was selling it off a sheet for $7 each.  The petitioner remembers taking two of them.  He left the bar with Ronnie Head, and they went to the house of someone named Brice to get some crack. Head left him there, and he rode around with John Funderburg until he was dropped off at the store.  (Vol. II, P-1 at 486-88, 500-01).

On February 16, 2002, the day after the killings, the petitioner gave a statement to law enforcement officials, in which he stated he had a few drinks with Ellzey, then went to the bar and drank liquor all night, spending $60 or $70.  At the bar, he bought two round, yellow pills from someone named Teddy for $11 each.  He did not know what they were when he bought them, and it could have been either acid or Ecstacy, though it seems like it was acid.  He took them between 3:00 and 5:00 a.m.  (Vol. II, P-1 at R-281, 285, 299-300, 303).

In August or September 2002, the petitioner gave another account of the evening

to Dr. McClaren, the state's expert.  He told Dr. McClaren that he had a few drinks with Ellzey before she dropped him off at the bar.  About an hour later, he bought three hits of LSD for $6 each and took them.  He also ingested a long, purple tablet.  Over the course of the evening, he consumed 3/4 of a fifth of whiskey.  He left the bar with a friend, looking for crack.  They found it at a house in Dixon's Corner where, in two trips, he bought and smoked $125 worth.  He left with another friend and stayed with him until being dropped off at the store.  (Vol. II, P-1 at R-510-11, 523).

Greg Rockwell testified that he worked the door at the bar.  He saw the petitioner arrive about 11:30 p.m. and leave about 1:00 a.m.  He returned within an hour, disheveled, sweating profusely, jumping and dancing around, then stopping to look at the wall for about 30 seconds before re-entering the bar.  Rockwell thought he looked as if he were wired, tripping on acid.  (Vol. II, P-1 at R-474-76).

Kelso Stewart testified the petitioner came up to him at the bar around 11:00 or 11:30 p.m. and asked if he knew where some acid or crack was.  Stewart left the bar and returned between 3:00 and 4:00 a.m.  He found the petitioner disheveled, all sweaty and kind of hyper and running around.  (Vol. I, P-1 at R-481-83).

Finally, John Funderburg gave a statement to police about two weeks after the killings.  He picked up the petitioner while he walked in Dixon's Corner.  The petitioner was "pretty wired out."  They went to "Doolie's," where the petitioner smoked a $20 rock of crack.  The petitioner also took some acid.  The witness did not see the petitioner drink.  For a while, the petitioner rode around with other people, but Funderburg dropped off the petitioner at the store.  Funderburg, who did several hundred dollars' worth of drugs that night and was "wiped out," said he picked up the petitioner about twilight and let him off at the store before midnight.  (Vol. II, P-1 at R-312-16, 326).

As to events on the morning of February 15, the petitioner testified at trial that he walked to the Paravicinis' from the store, knocked on the door, and Jeffrey let him in.  He knew who Jeffrey and Gerald were.  He sat in Jeffrey's bathroom, feeling real scared and

flipping out, before calling Ellzey, thinking that might calm him down but knowing she would be upset if she realized he'd taken drugs.  He remembers nothing after calling her number until coming to while driving the minivan in Mississippi.  (Vol. II, P-1 at R-489-91, 493–94, 497, 502).

Inside the trailer, the petitioner testified, he began to see the walls move.  He also saw a larger-than-life "somebody" walking towards him, and it made him scared for his life.  The petitioner testified both that he first saw this apparition before retrieving the rifle and that he first saw it after he retrieved it.  He came out of the bathroom trembling and scared.  He does not know whether Jeffrey or Gerald turned into this apparition, and he does not remember firing the rifle.  (Vol. II, P-1 at R-493-95).

The day after the killings, the petitioner gave a statement to Alabama law enforcement officers in which he denied remembering anything after dialing Ellzey's number until he came to while  driving the minivan in Mississippi.   On separate occasions, he spoke with both Mississippi and Alabama law enforcement officers on February 16, without telling any of them about an apparition.  (Vol. II, P-1 at R-284, 287-88, 294-95, 502-03).

When interviewed by Dr. Brown, the defense expert, in June 2002, the petitioner stated that, when he came in the trailer, he didn't feel exactly right and went into the bathroom.  He exited and called Ellzey.  While talking with her, he began to feel quite weird and bad, went back in the bathroom, came back out and perceived a formless, indescribable visual perception in the room with him and Gerald, a very frightening image.  The petitioner also felt that other people were after him, trying to get him.  His next memory was of driving the minivan in Mississippi.  (Vol. II, P-1 at R-336-38).

When interviewed by Dr. McClaren in August or September 2002, the petitioner said he remembered arguing with Ellzey on the telephone over his failure to call her to pick him up, that he began tripping out and feeling frightened, that he heard someone holler his name, that he felt like everyone was against him and trying to hurt him, and that

he felt like the only way out was to shoot his way out.  The petitioner denied any additional memories before finding himself driving the minivan in Mississippi.  (Vol. II, P-1 at R-511).

The night of February 14 and 15 was not the petitioner's first experience with drugs or alcohol.  He had taken LSD multiple times and had used "plenty" of cocaine, starting when he was 17.  By the time of the killings, he was experienced with alcohol, LSD, crack, marijuana, T's and blues, Ecstasy, and prescription medication.  Ellzey discovered needles he used for taking drugs, and she kicked him out of her house two weeks before the killings when she realized he was taking her tranquilizers.  (Vol. II, P-1 at R-438, 486-87, 509, 512).

Nor was the morning of February 15 the petitioner's first encounter with violence.  He and Ellzey argued repeatedly about the petitioner's drug use.  In 1990, during one of these arguments over the telephone, the petitioner fired a pistol directly into his chest, in response to his feeling of rejection and potential abandonment.  He was hospitalized for almost two weeks, and the couple were married about a month later.  During their relationship, the petitioner pulled Ellzey's hair, slapped her, and broke her glasses.  (Vol. II, P-1 at R-351, 438-41, 463-64).

Dr. Brown, a psychiatrist, testified for the defense.  He related a childhood history of poverty, low academic achievement, embarrassment among his peers stemming from both, and chronic snubbing by his "parents" (actually, his aunt and uncle, who raised him from a young age) in favor of his "siblings" (actually, his cousins).  Dr. Brown diagnosed the petitioner with borderline personality disorder ("BPD"), a condition characterized by inner emptiness and dissatisfaction, impulsive actions undertaken in an effort to feel better, and limited, intense, fluctuating relationships.  The defenses of such a person in dealing with the world are fragile, and they can more readily be thrown into psychotic behavior by increases in anxiety from any source.  This condition dates from the petitioner's childhood and is unrelated to his use of intoxicants before the killings.  (Vol.

II, P-1 at R-330, 342, 352-55).

Dr. Brown testified that LSD is, per weight, the most psychotogenic drug in the world.  It frequently causes frightening perceptual distortions and hallucinations, as well as feelings of detachment from reality, that is, psychosis.  Using alcohol and cocaine at the same time figuratively throws gasoline on the fire.  (Vol II, P-1 at 347-49, 359, 362).

Dr. Brown opined that the petitioner was psychotic at the time of the killings, that is, that at such time he was suffering from a severe mental disease or defect that rendered him unable to appreciate the nature and quality or wrongfulness of his acts.  He based this opinion on the absence of any predetermination to kill (as reflected by his apparent normalcy on which Jeffrey relied in admitting him to the trailer and by his unarmed status), the absence of any motivation for the killings, and the fact that they involved his closest friends (the Paravicinis) and bare acquaintances apparently selected at random (the Barbers).  Dr. Brown opined that this psychosis resulted from "a combination of his preexisting personality structure acted upon by the heavy overload of drugs that he has been taking all night, in which psychosis he is crazily fearful and acting in a highly destructive fashion."  He testified that the petitioner's BPD "in and of itself" probably did not trigger his conduct and that it is "quite possible" that, had the petitioner not ingested drugs and alcohol, the killings would not have occurred.  (Vol. II, P-1 at R-362-64, 372-73).

Dr. McClaren, a psychologist, testified for the state.  Like Dr. Brown, he diagnosed BPD, and he agreed with Dr. Brown that a possible complication of this condition is brief reactive psychosis, which can be triggered by a catastrophic stress such as the loss of a loved one.  Dr. McClaren acknowledged that the petitioner has a demonstrated inability to cope well with stress.  He agreed that a history of suicide attempts indicates a more severe form of BPD, and he acknowledged that he was aware of multiple such attempts by the petitioner, both from the petitioner's statements and from the marks on his body.  Dr. McClaren noted that another hallmark of BPD is extreme

anger.  Dr. McClaren diagnosed the petitioner with anti-social personality disorder and substance abuse in addition to BPD.  (Vol. II, P-1 at R-504, 516, 525-28, 531, 534).

Dr. McClaren was confident that, assuming the truth of the petitioner's self-report of drug and alcohol ingestion before the killings, he was very intoxicated.  He testified that LSD can result in psychosis associated with hallucinations and perceptual distortions, and he confirmed that the results of the disorder last from eight to twelve hours.  He testified further that the petitioner's amnesia was probably chemically induced.  (Vol. II, P-1 at R-523, 529-30, 533).

Dr. McClaren opined that the petitioner knew what he was doing and knew its wrongfulness because he had no significant psychiatric history and because his conduct indicated such awareness.  Dr. McClaren noted the purposefulness of the petitioner's actions in shooting each victim in or near the head, in shooting each victim twice, in taking Clair's purse, in trying to commandeer Billedeaua's vehicle, in backing down when confronted by the armed Evans, in proceeding to the Barbers' house, and in taking their keys and minivan.  Dr. McClaren opined that the petitioner's intoxication exacerbated his BPD by allowing the petitioner's anger to come out in the manner it did, with the provocation triggering the anger being the unpleasant or threatening conversation with Ellzey.  He concluded that, without the intoxication, the killings probably would not have occurred.  He quoted the petitioner as having said, "[F]our innocent lives for a night of drugs."  (Vol. II, P-1 at R-519-24, 531, 537-39).

## GROUNDS FOR RELIEF

The petitioner identifies thirteen grounds for relief:

- That counsel were ineffective in electing to present an invalid insanity defense;

- That counsel were ineffective in failing to properly present a challenge to intent based on intoxication;

- That counsel were ineffective in failing to challenge certain opinions articulated by Dr. McClaren;

- That the jury charges unconstitutionally shifted the burden of proof to him, and that counsel were ineffective in failing to challenge them on this ground;

- That counsel were ineffective in failing to challenge the sufficiency of the evidence for conviction of capital murder;

- That counsel were ineffective with respect to the aggravating factor of great risk of death to many persons;

- That counsel were ineffective with respect to the mitigating factor of substantial impairment;

- That counsel were ineffective in failing to present additional mitigation witnesses;

- That the prosecutor engaged in unconstitutional conduct and that counsel were ineffective in failing to challenge this misconduct;

- That the prosecutor unconstitutionally used the grand jury proceedings to conduct discovery and that counsel were ineffective in failing to challenge this abuse of the grand jury process;

- That Alabama's compensation scheme for appointed counsel in capital cases is unconstitutional and that counsel were ineffective in failing to challenge the scheme on this basis;

- That the trial court's adoption of the state's proposed Rule 32 order violated the petitioner's due process rights; and

- That he is entitled to develop and present evidence of mental retardation.

## DISCUSSION

To establish ineffective assistance of counsel, "a petitioner must show that

counsel's performance was deficient and that he was prejudiced by that deficiency.  A petitioner must overcome a strong presumption of competence, and the court must give significant deference to the attorney's decisions."  *Hagins v. United States*, 267 F.3d 1202, 1204-05 (11th Cir. 2001) (internal citations omitted).  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that *no* competent counsel would have taken the action that his counsel did take."  *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added).  "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption" of competent representation.  *Id*. at 1314 n.15.

An attorney's trial strategy must be upheld if it is a reasonable one.  *Chandler*, 218 F.3d at 1315 n.16.  To make this determination, "we need not attempt to divine the lawyer's mental processes underlying the strategy."  *Id*.  If the course that counsel took is reasonable, "it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of [his selected course] was not a deliberate choice between" courses of action.  *Id*.

This does not mean that a strategy selected in ignorance of its ramifications and of alternative courses of conduct is necessarily a reasonable one.  Rather, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Wiggins v. Smith*, 523 U.S. 510, 528 (2003) (internal quotes omitted).

Prejudice requires a showing of a "reasonable probability that the result of the proceedings would have been different had counsel not performed deficiently," with a reasonable probability defined as "a probability sufficient to undermine confidence in the outcome." *Lynd v. Terry*, 470 F.3d 1308, 1315-16 (11th Cir. 2006).

Furthermore, "it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance" of counsel.  *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994).  Rather, an attorney's performance may be found ineffective in the

constitutional sense only if "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

With respect to legal conclusions drawn by the state court, Congress has provided as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ....

28 U.S.C. § 2254(d)(1).

The "clearly established Federal law" contemplated by subsection (1) consists only of Supreme Court holdings extant at the time of the state decision. *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1208 (11th Cir. 2007). A state decision is "contrary to" such precedent if it either "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if it "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that reached by the High Court. *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (internal quotes omitted). A state decision represents an "unreasonable application" of Supreme Court precedent "if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case." *Id*. at 792. "An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Osborne v. Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006). In either event, unreasonableness is measured by an objective standard. *Id*. The petitioner bears the burden of showing that the state court's ruling was contrary to, or involved an unreasonable application of, controlling Supreme Court precedent. *Anderson v.*

-14-

*Secretary, Department of Corrections*, 462 F.3d 1319, 1325 (11th Cir. 2006); *Ventura v. Attorney General*, 419 F.3d 1269, 1286 (11th Cir. 2005).

With respect to factual findings made by a state court, Congress has declared:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> ...
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(2). In addition:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

*Id*. § 2254(e)(1). The petitioner bears the burden of showing both that a factual finding is incorrect and that the incorrectly found fact was unreasonably determined. *E.g., Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006).

## I. **Ineffective Assistance - Insanity Defense.**

Insanity is an affirmative defense under Alabama law, which the defendant must prove by clear and convincing evidence. Ala. Code § 13A-3-1. The affirmative defense requires proof that, "at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts." *Id*. § 13A-3-1(a). "Intoxication in itself does not constitute mental disease or defect within the meaning of Section 13A-3-1." *Id*. § 13A-3-2(d).

Voluntary intoxication is not a defense to any criminal charge. Ala. Code § 13A-3-2(a). "However, intoxication, whether voluntary or involuntary, is admissible in

evidence whenever it is relevant to negate an element of the offense charged." *Id*. Thus, for example, evidence of voluntary intoxication may be introduced in an effort to "negate the specific intent necessary for an intentional murder, reducing the offense to manslaughter." *E.g., Ex parte McWhorter*, 781 So. 2d 330, 340 (Ala. 2000). Both at the time of trial and presently, "[t]he degree of intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity." *Ex parte Bankhead*, 585 So. 2d 112, 121 (Ala. 1991); *accord Ex parte McWhorter*, 781 So. 2d at 341, 342-43.

The petitioner argues that his counsel were ineffective because they presented an affirmative defense of insanity under Section 13A-3-1 that was based on his voluntary intoxication and thus "doomed as a matter of law." He continues that, by coupling intoxication with insanity, counsel "drowned in the doomed insanity undertow" a promising challenge to his criminal intent under Section 13A-3-2(a) based on the same evidence of voluntary intoxication. (Doc. 11 at 19-21, 59-61).[7] The petitioner's argument misapprehends both challenges.

Under Alabama law, a murder defendant has two cracks at insanity. First, he may attempt to prove that he was insane other than from mere intoxication and, if successful, be exonerated from criminal liability. Second, he may offer evidence that he was insane from voluntary intoxication and thereby hope to raise a reasonable doubt as to whether he possessed the requisite intent to kill, reducing the maximum charge to manslaughter. As discussed below, counsel pursued both tracks.

With respect to the affirmative defense of insanity, Dr. Brown testified that the petitioner had BPD (a recognized mental disorder unrelated to his intoxication) and that such a person can descend into psychosis when confronted with increased anxiety.[8] Dr.

---

[7]The Court utilizes the pagination of the amended petition rather than those assigned by CM/ECF.

[8]Psychosis was defined at trial as "a much more severe mental illness or mental disorder where a person's ability to perceive the world of reality is at times seriously

McClaren not only agreed with Dr. Brown but conceded that the petitioner's history of self-destructive behavior reflected a more severe form of the disorder.  Tying the condition to the facts, counsel elicited evidence that, immediately before the slayings began, the petitioner was subjected to a sudden and dramatic increase in his anxiety when his ex-wife — to whom he was still emotionally attached and with whom he desired reconciliation — expressed her displeasure with his conduct of the preceding evening and indicated that their continued relationship was in peril.  This correlated nicely with evidence that the petitioner had previously shot himself in the chest during a telephone argument with Ellzey, in response to his feelings of rejection and potential abandonment by her.

It is clear from this discussion that trial counsel did not base the affirmative defense of insanity simply on the petitioner's intoxication.  Instead, they endeavored to show that the petitioner slipped into psychosis quite independently of his intoxication, based on a combination of his pre-existing BPD and the trigger of a sudden surge in stress and anxiety resulting from Ellzey's threatened abandonment.

The petitioner appears to argue that, even if counsel at trial attempted to show insanity independent of intoxication, they knew from Dr. Brown's pretrial report that any such effort would be futile.  (Doc. 11 at 9-12, 62).  His report concluded that the petitioner suffered from BPD and was psychotic at the time of the killings, but it also concluded that "[t]his irrational process of a psychotic nature was precipitated by his indulgence in the drugs mentioned above which produced in him a paranoid psychosis ...."  (Vol. III, P-1 at OR-784-85).  That is, Dr. Brown identified intoxication, rather than a stressful interpersonal situation, as the trigger catapulting the petitioner's BPD into psychosis.

The petitioner's argument fails for at least two reasons.  First, Dr. Brown's report

---

impaired."  (Vol. II, P-1 at R-517). The briefs of both parties treat psychosis as equivalent to insanity.

did not render it futile to pursue an affirmative defense of insanity independent of intoxication, because the report was not the last word.  As their questioning at trial reflects, counsel were aware that a sufficiently stressful situation (such as the petitioner's perceived abandonment by Ellzey) can trigger a psychotic episode in a person with BPD regardless of intoxication, and they successfully elicited such testimony from both experts.  The jury could have extrapolated from this evidence that the petitioner was sent into psychosis independent of intoxication.  Nor did Dr. Brown's testimony preclude the jury from doing so; while he testified that the BPD alone "probably" did not trigger the petitioner's conduct, he also testified that removing intoxication from the equation would make it only "possible" that the killings would not have occurred.  The jury was of course free to draw its own conclusions from the evidence and was not required to accept the construction the petitioner now champions.

Second, the petitioner assumes that Alabama law precludes an affirmative defense of insanity if voluntary intoxication played any role (or any but-for role) in triggering the psychosis, but he has failed to demonstrate that the law is (or was in 1992) so constricted. Section 13A-3-2(d) says only that intoxication does not constitute a mental disease or defect "in itself," an undefined term that might be construed to mean "standing alone," thereby leaving room for intoxication to constitute one of multiple factors causing psychosis.  Indeed, two years before trial in this case, a state appellate court held that, where the defendant based his affirmative defense of insanity on evidence that he had BPD, that he had ingested large quantities of alcohol and cocaine on the night of the rape, and that the rape would not have occurred but for the intoxication, "[i]n the instant case the jury was free to accept or reject the insanity defense." *Justo v. State*, 568 So. 2d 312, 314-15 (Ala. Crim. App. 1990).  Whatever Alabama law may actually be on this score, at the time of trial defense counsel was not precluded from pursuing an insanity defense in

which intoxication acted upon BPD to produce psychosis.[9]  And there was ample evidence to support such an argument, since Dr. Brown indicated that the petitioner's BPD was a but-for cause of the psychosis.

In short, insanity was a viable affirmative defense both legally and factually, not a defense "doomed as a matter of law."  The Court must therefore reject the petitioner's argument that counsel performed deficiently by presenting a doomed defense.

Nor did counsel perform deficiently by "drown[ing]" their challenge to intent "in the ... insanity undertow."  Under Alabama law, the petitioner's intoxication could be used to counter evidence of his intent to kill, but only if his intoxication was so extreme as to "amount to insanity."  *Ex parte Bankhead*, 585 So. 2d at 121.  That is, the petitioner's intoxication was legally irrelevant to intent unless it rendered him insane. Divorcing intoxication from insanity, as the petitioner insists should have been done, would have legally doomed his reliance on intoxication and defeated the effort to challenge intent.[10]

To the extent the petitioner suggests that counsel had a responsibility to abandon a viable affirmative defense in order to concentrate the jury's attention solely on his challenge to intent due to intoxication, that decision represents a quintessentially strategic one,[11] and "a court may not second-guess counsel's strategy."  *Chandler*, 218 F.3d at 1314 n.14.  The only question is whether the chosen strategy "might have been a reasonable one."  *Id*. at 1315 n.16.

---

[9]Notably, the state never argued to the contrary, even though — since acceptance of the affirmative defense would have allowed the petitioner to escape conviction — it had a vested interest in challenging an incorrect construction of the insanity statute.

[10]The petitioner surely understands this, since he insists that counsel should have called additional experts to testify that someone under the influence of LSD might be unable to appreciate the wrongfulness of his conduct.  (Doc. 11 at 28, 37).

[11]"[R]eliance on [one] line of defense to [the] exclusion of others is [a] matter of strategy."  *Chandler*, 218 F.3d at 1314 n.14.

There were more than adequate reasons for counsel not to place all their eggs in the intoxication basket.  First, "[g]enerally, juries are not persuaded by an intoxication defense."  *Boehm v. Crosby*, 146 Fed. Appx. 422, 425 (11th Cir. 2005).  The unpopularity of intoxication with juries could not have been lost on counsel, and the petitioner's long history of substance abuse made intoxication even less likely to attract juror support.  *See, e.g., Housel v. Head*, 238 F.3d 1289, 1296 (11th Cir. 2001) ("Evidence of drug and alcohol abuse is a two-edged sword, ... and a lawyer may reasonably decide that it could hurt as much as help the defense.") (internal citations and quotes omitted).  Insanity based on a mental condition — either standing alone or in concert with intoxication — offered the jury a more palatable means of reaching a favorable verdict than simple intoxication.

Second, the case for LSD-induced psychosis was far from airtight, beginning with whether the petitioner actually ingested LSD at all.[12]  The day after the killings, the petitioner was unsure whether he had taken acid or something else.  Moreover, he gave three different accounts of what he paid for the LSD, and he could not decide whether he had received the LSD in pill form or sheets.  The day after the killings, he remembered buying the drugs from Teddy, but by trial he denied knowing either who sold him the drugs or anyone named Teddy.  His conflicting statements as to alcohol consumption — sometimes he said it was beer, other times that it was liquor — did not enhance his credibility.  The only witness claiming to have seen the petitioner ingest LSD admitted to being "wiped out" at the time, and he showed himself ignorant of the facts by claiming that the night's activities ended before midnight.[13]

---

[12]The petitioner has not argued, much less presented evidence, that either alcohol or cocaine reduced him, or could have reduced him, to a psychotic state.

[13]The petitioner insists that his intoxication is beyond question because the state conceded as much at trial.  (Doc. 11 at 8 & n.4).  Even if that is a correct reading of the record, counsel could not have known before trial that the state would be so accommodating.  Nor did Dr. McClaren's pretrial report remove the issue of the petitioner's intoxication from the table, since it concluded only  that the petitioner was probably under the influence "*if* his self-report is true." (Vol. III, P-1 at OR-771 (emphasis added)).

Assuming the petitioner in fact ingested LSD, the evidence was inconsistent as to when he did so (with the petitioner himself offering times ranging from midnight to 5:00 a.m.) and how much he consumed (with the petitioner offering both two hits and three as the figure, and with the strength of the hits unknown). There was also the petitioner's suspicious failure to tell either of two sets of law enforcement officers within 48 hours of the killings that he had seen an apparition, much less that he had been frightened of it, that he had been scared for his life, and that he had felt he had to shoot his way out — these circumstances first being articulated several months later, to the experts. Even on the witness stand, the petitioner contradicted himself as to whether he had any memory after dialing Ellzey's number and as to whether he first saw the apparition before or after he retrieved the rifle. His trial testimony that he did not remember his conversation with Ellzey was contradicted by his statement to Dr. McClaren that she expressed her displeasure with him for not calling her to pick him up. Finally, the petitioner's conduct — including without limitation his calm demeanor, his verbally responding to Ellzey's criticisms only seconds before shooting Jeffrey, his conducting a conversation with Clair without shooting her, and his verbalized appreciation that Gerald was wounded and needed medical care — all indicated that he was solidly in contact with reality and not hallucinating monsters or entertaining paranoid delusions.[14]

Although the affirmative defense of insanity faced its own obstacles, nothing required counsel to present only one of two problematic defenses. Indeed, in such a situation counsel may well improve the chances the jury will return a favorable verdict by offering two rationales for doing so — a prospect enhanced further by the possibility the

[14]The petitioner objects that this apparent tension between LSD-induced psychosis and his seemingly unimpaired behavior and cognition exists only because counsel did not present expert evidence resolving the tension. As discussed in Part II, however, the evidence the petitioner insists should have been presented addresses only the conduct a hypothetical individual might exhibit while in such a state, while failing to support (and indeed weakening) the proposition that the petitioner's own conduct could be consistent with such a psychosis.

jury can agree on the outcome while disagreeing on the rationale.  Counsel's decision to present an affirmative defense of insanity in addition to challenging intent based on intoxication was plainly a reasonable strategic decision.  That it was not the only reasonable strategy that could have been devised is irrelevant.

The petitioner raised this claim in state court, and the Court of Criminal Appeals adjudicated it on its merits.  (Vol. IX, P-26 at 13-17).  The state court found that the minor premise of the petitioner's argument — that the insanity affirmative defense was based only on his intoxication — was false.  This finding is presumed to be correct, and the petitioner has the burden of proving by clear and convincing evidence that it is not correct, as well as the further burden of showing that the finding was not merely wrong but unreasonable in light of the evidence presented.  The petitioner has not attempted to meet his heavy burden and, as discussed above, the state court's finding is patently correct.

The state court concluded that counsel did not perform deficiently within the meaning of *Strickland*.  (Vol. IX, P-26 at 9-10, 16-17).  The petitioner argues that this conclusion is inconsistent with *Strickland* and *Wiggins* because, since an affirmative defense of insanity based solely on intoxication is plainly a legal impossibility, counsel's employment of such a defense establishes that they did not undertake an objectively reasonable investigation as required by those cases.  (Doc. 11 at 59-60).  Because, as previously discussed, counsel did *not* base the affirmative defense of insanity on simple intoxication, the petitioner's argument is meritless, and the petitioner has not met his burden of showing that the state ruling is contrary to, or represents an unreasonable application of, any Supreme Court holding.  Far from it, and as demonstrated above, the state ruling is plainly correct.

In summary, the petitioner has failed to show that counsel performed deficiently in electing to advance an affirmative defense of insanity.  The petitioner is thus not entitled to relief on this ground.

-22-

## II.  Ineffective Assistance - Intent.

The petitioner argues that counsel provided ineffective assistance with respect to the presentation of his challenge to intent because they coupled intoxication with insanity rather than with intent and because they did not investigate and procure the assistance of a second expert.  (Doc. 11 at 20, 61-64).  As discussed in Part I, counsel could not have been ineffective in linking intoxication with insanity, because Alabama law renders intoxication irrelevant to intent unless the intoxication amounts to insanity.  This leaves for consideration the petitioner's "failure to investigate" claim.  (*Id*. at 61).

The petitioner argues that counsel should have investigated and obtained the services of a second expert to identify the effects of alcohol, crack and LSD and to explain how his behavior (contrary to Dr. McClaren's opinion) was consistent with drug-induced psychosis.  (Doc. 11 at 61-64).  The petitioner presented two such experts at the Rule 32 hearing: a psychopharmacologist from Maryland and a psychiatrist certified in forensic psychiatry and addiction psychiatry from Michigan.

> In order to show ineffective assistance of counsel for counsel's failure to investigate and present expert testimony at the sentencing phase, we have held that the petitioner must show: "(a) that it was professionally unreasonable for counsel not to investigate; (b) what kind of, and how much, investigation an ordinary, reasonable lawyer would have undertaken; (c) that it is reasonably probable that a reasonable investigation would have turned up an expert who would have presented testimony similar to that which was eventually adduced; and (d) that it is reasonably probable that this testimony would have affected the sentence eventually imposed.  Failure to meet *any* of these steps defeats the ineffectiveness claim."

*Fugate v. Head*, 261 F.3d 1206, 1221-22 (11th Cir. 2001) (emphasis in original) (quoting *Elledge v. Dugger*, 823 F.2d 1439, 1446 n.15 (11th Cir. 1987)).  The petitioner stumbles repeatedly on these requirements.[15]

---

[15]While the *Fugate* test addresses ineffective assistance claims at the sentencing phase, the Court concludes that a parallel test governs such claims at the guilt-innocence

First, the petitioner identifies no evidence that counsel did not investigate additional trial experts.  The obvious source for such evidence would be trial counsel themselves, but the petitioner presented no affidavit or other testimony from them at the Rule 32 hearing, even though they have continued to practice law in Mobile since his trial.

Second, the petitioner has not shown that "it was professionally unreasonable for counsel not to investigate" additional experts, assuming they did not do so.  There is no question but that Dr. Brown's expert testimony (combined with the lay testimony of witnesses concerning the petitioner's ingestion of drugs and alcohol) was sufficient to allow a properly functioning jury to form a reasonable doubt as to the petitioner's intent, due to intoxication amounting to insanity, and the petitioner does not argue otherwise.  Nor is there any question that Dr. Brown was an appropriate expert to support the challenge to intent, because the petitioner insists that "defense counsel asserting an insanity defense must enlist psychiatric assistance in support of their claim," (Doc. 11 at 62), intoxication is relevant to intent only if it amounts to insanity, and Dr. Brown is a psychiatrist who has testified as such in several hundred cases.  (Vol. I, P-1 at R-332-33).

The petitioner nevertheless argues that it was professionally unreasonable not to investigate additional experts because Dr. Brown was not sufficiently knowledgeable about the effects on the mind of LSD, crack and alcohol and was unable to counter Dr. McClaren's opinion that the petitioner's behavior was inconsistent with drug-induced psychosis.  (Doc. 11 at 26, 63).  As a threshold matter, the petitioner has identified no evidence that Dr. Brown was unable to provide additional testimony in these regards; instead, he assumes that, because Dr. Brown did not provide additional testimony, he had none to give.  This would be a reasonable assumption had Dr. Brown been asked questions directly on these topics and been unable to answer, but that did not occur.  He was not asked, for example, whether one in a drug-induced psychosis can appear calm

phase.  The petitioner has not suggested any alternative test.

and purposeful but not appreciate the wrongfulness of his conduct.[16]  Nor did the petitioner present evidence from counsel or from Dr. Brown at his Rule 32 hearing to establish his limited knowledge.[17]  The petitioner has thus failed to establish that Dr. Brown could not have supplied the additional testimony he believes should have been provided.

Even had the petitioner met this burden, he has not shown that it would be objectively unreasonable for counsel to rely on an expert able and qualified to render every opinion necessary to support a reasonable doubt concerning intent due to intoxication but unable to render additional opinions helpful in countering the state's expert.  This is especially so when, as here, there is no evidence that the retained expert informed counsel that more experts were needed.  *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("The experts [counsel] had retained did not did not state that they required the services of these additional experts.  There was no need for counsel to seek them out independently.").

As to the third *Fugate* requirement, the petitioner has not addressed the investigation a reasonable attorney would have undertaken.  "In making this determination, the court must look to what constitutes a reasonable effort; i.e., what a competent attorney would have done given the constraints of time and money under the facts of the case," *Elledge v. Dugger*, 823 F.2d at 1446 n.14, mindful that "the duty is

---

[16]Due to scheduling issues, Dr. Brown testified well before Dr. McClaren.  (Vol. II, P-1 at R-328-29).  Thus, and because Dr. McClaren's pretrial report did not reflect any opinions concerning the inconsistency between the petitioner's behavior and drug-induced psychosis, (Vol. III, P-1 at OR-768-72), counsel did not know when questioning Dr. Brown that Dr. McClaren would so testify.

[17]Indeed, the testimony of the petitioner's expert at the Rule 32 hearing — that it was generally known in the field of psychiatry in 1992 that a person in a state of drug-induced psychosis could know what he was doing and yet not appreciate its wrongfulness, (Vol. VIII, P-15 at 69) — indicates that Dr. Brown may well have been capable of so testifying.

only to conduct a reasonable investigation.  Counsel is not required to 'shop' for a psychiatrist who will testify in a particular way." *Id*. at 1447 n.17.  To meet his burden, "a petitioner could present testimony from ... members of the bar relating to the amount of investigation that is reasonable in such a situation ...." *Id*. at 1447 n.17.  At the Rule 32 hearing, the petitioner presented no such evidence of the constraints facing counsel nor of the amount of investigation a reasonable attorney facing those constraints and the facts of the case would make.  Here, as in *Horsley v. State*, 45 F.3d 1486 (11th Cir. 1995), "[t]he record in this case fails to demonstrate what kind and how much investigation a reasonable lawyer would have made *in the circumstances of this case*." *Id*. at 1495 (emphasis in original).

Finally, the petitioner has not shown that, had testimony such as that of his Rule 32 experts been offered at trial, there is a reasonable probability the jury would have entertained a reasonable doubt as to whether he possessed the intent to kill, based on intoxication amounting to insanity.  As noted, the petitioner argues that additional experts would have shown that the petitioner's conduct was consistent with a drug-induced psychosis.  In fact, the experts' testimony in this regard is laden with telling qualifiers.  Thus, for example, one expert testified that the petitioner's seeming normalcy at the time of the killings does not "rule out the possibility" that he was psychotic due to LSD ingestion, because a psychotic person "can" appear normal.  Similarly, the other expert testified that the petitioner "could have been" psychotic despite sounding calm and sober. (Vol. VIII, P-15 at 33-34, 146).[18]

Other testimony from the experts suggests why they were so guarded in their

---

[18]The experts presented no evidence that alcohol can cause psychosis, but only that it can impair judgment.  (*Id*. at 28). They testified that cocaine, which usually prompts feelings of euphoria, can cause psychosis given a sufficiently large ingestion, (*id*. at 137), but they did not opine or suggest that the petitioner had ingested enough crack to cause this effect.  Nor did they opine that alcohol or crack would exacerbate the effects of LSD. (*Id*. at 32-33, 141, 143).  All their discussion of psychosis was based purely on LSD ingestion.

-26-

opinions.  The only psychotic imaginings they identified as potentially stemming from LSD and potentially prompting the petitioner's repeated discharge of a firearm were hallucinations of threatening beings and paranoid delusions that real persons (whether or not re-conceived as monsters) were threatening him.  (Vol. VIII, P-15 at 37-38).  But as they acknowledged, such imaginings would be "frightening" to the petitioner, (*id*. at 151), and fright sufficient to prompt a person to retrieve a gun and repeatedly discharge it at perceived mortal threats is not usually accompanied by the calmness the petitioner manifested as he shot Jeffrey and Gerald.  Neither expert testified that a person frightened to such an extreme degree by a drug-induced hallucination or paranoid delusion would go serenely about his business of exterminating the threat.[19]

For that matter, neither expert testified that a person experiencing a drug-induced hallucination or paranoid delusion would respond by retrieving a gun and affirmatively seeking out his nemeses, as the petitioner repeatedly did.  On the contrary, they testified unequivocally and repeatedly that the single organizing response to such a threat would be to "escap[e]," (Vol. VIII, P-15 at 37-38, 151, 153) — an impulse utterly incompatible with the petitioner's conduct in: shooting the fleeing Jeffrey from behind; seeking admittance to the Barber home after "escaping" from the Paravicini trailer, and killing Linda and Freddie at close range with multiple head shots as soon as the door opened; ignoring the car keys hanging in the kitchen in favor of killing the sleeping Bryan; ignoring the keys beside Bryan's bed in favor of  continuing down the hallway toward Brad while repeatedly saying, "I'm coming to get you, buddy."  The experts made no effort to square the petitioner's actual conduct with an "escape" impulse.  In short, the proposed expert testimony, far from shoring up the defense, would have glaringly exposed the fundamental implausibility of the petitioner having killed his victims under

---

[19]The examples given of a psychotic's calm response to perceived threats — plugging up showers and toilets to prevent the possibility of a green monster emerging, and quietly planning how to get out of a courtroom filled with threatening people, (*id*. at 145, 152) — are so far removed from the facts of this case as to be meaningless.

an LSD-induced psychosis.

The second purpose of the proposed experts' testimony was to explore the effects of LSD, crack and alcohol.  Their testimony in this vein moved significantly beyond that presented at trial in three respects: that LSD can cause paranoid delusion; that a user can slip very quickly from Stage 3 (where he understands his hallucinations are a product of the drug) to Stage 4 (where he does not and enters psychosis); and that Stage 4 is often accompanied by memory loss (or non-formation).  (Vol. VIII, P-15 at 38, 132, 145, 147-48, 151-52).[20]  As discussed above, however, the experts did not provide testimony explaining why a "frightened" paranoid desiring to "escape" his tormentors would repeatedly track them down and shoot them (twice each) in the head from essentially point-blank range.  Their testimony about the Stage 3 - Stage 4 border and memory impairment may be consistent with the petitioner's description of his experience, but they admit that alcohol — which is not claimed to cause psychosis — affects memory similarly.  (*Id.* at 28, 118).[21]

Although ignored by the petitioner, the proposed experts' testimony as to the duration of LSD's effects also made it less likely the petitioner could have been psychotic at the time the killings occurred.  They testified that the maximum effects of LSD are felt about one hour after ingestion and that the effects usually are completely gone within four to six hours.  (Vol. VIII, P-15 at 62, 147, 188).  While the petitioner initially stated that he ingested the LSD between 3:00 and 5:00 a.m., he told Dr. McClaren that he took the LSD about an hour after arriving at the bar, and he and multiple other witnesses testified that he arrived there between 11:00 and 11:30 p.m.  The experts' proposed testimony virtually

---

[20]Except as previously discussed, the experts' testimony as to the effects of alcohol and crack cocaine did not move appreciably beyond that presented at trial.

[21]Contrary to the petitioner's assertion, (Doc. 11 at 33), the experts did not state that the descent into Stage 4 could be triggered by the petitioner's unsatisfactory telephone conversation with Ellzey.  (*Id.* at 148-49).

eliminated the possibility, under the latter time frame, that the petitioner could have been psychotic when the killings occurred at or after 6:00 a.m.

The petitioner insists that the Rule 32 experts' testimony "would have powerfully supported the defense that [the petitioner] did not have the mental state necessary for a capital murder conviction." (Doc. 11 at 40). As the foregoing discussion reveals, the effect of their testimony would have been very nearly the opposite: powerful evidence that the petitioner was not in a drug-induced psychosis, and thus capable of forming the intent to kill. There is plainly no reasonable probability that, had the proposed expert testimony been offered, the petitioner would have been acquitted of murder.

The petitioner raised this claim in state court, and the Court of Criminal Appeals adjudicated it on its merits. The state court reached conclusions similar to those of this Court: that the petitioner failed to show that trial counsel did not investigate additional experts; that he failed to show what a reasonable investigation would be under the circumstances; that trial counsel did not perform deficiently by failing to present additional experts; and that there is no reasonable probability that the presentation of testimony similar to that of the proposed experts would have caused the jury to harbor a reasonable doubt as to the petitioner's intent to kill due to intoxication. (Vol. IX, P-26 at 18-24). To meet his burden under Section 2254(d), the petitioner argues only that counsel failed to perform a reasonable investigation under *Wiggins*. (Doc. 11 at 61). As discussed above, however, he has not met his burden of supporting that proposition. The petitioner does not challenge the state court's determination that any such failure did not prejudice him, and that ruling is both preserved under Section 2254(d) and plainly correct.

In summary, the petitioner has failed to show either that counsel performed deficiently in presenting only Dr. Brown as an expert or that he was prejudiced by any unreasonable failure to investigate and procure additional experts such as those presented at the Rule 32 hearing. The petitioner is thus not entitled to relief on this ground.

-29-

**III.  Ineffective Assistance - Failure to Challenge the State's Expert.**

As noted previously, Dr. McClaren concluded that the petitioner was intoxicated (assuming his self-report was true) but nevertheless understood what he was doing and realized its wrongfulness.  Dr. McClaren based this opinion largely on the petitioner's methodical, purposeful conduct in dispatching multiple victims at two sites with precise shots, backing down when confronted by an armed neighbor, attempting to commandeer a passerby's vehicle, and taking a purse, keys and vehicle from the victims.

The petitioner argues that counsel were ineffective in "failing to challenge, as lacking in relevant expertise," Dr. McClaren's opinion concerning the inconsistency between the petitioner's conduct on the one hand and an inability to appreciate the nature and quality or wrongfulness of his acts on the other, because he "acknowledged that he was not an expert on the effects or interactions of drugs in the human brain."  According to the petitioner, there could be no legitimate reason for counsel not to challenge Dr. McClaren's "admittedly incompetent expert testimony."  (Doc. 11 at 64-65).

Actually, Dr. McClaren made no admission of incompetence.  Instead, he testified that he could not "quantify or explain to the jury how crack, LSD and alcohol interact in the brain ... [a]t a molecular psychopharmacology level."  (Vol. II, P-1 at 530-31 (emphasis added)).  That is, he stated only that he could not address the mechanism by which these intoxicants cause effects on the brain; he did not state that he was ignorant of what those effects are (indeed, he addressed them in his testimony).  The correct reading of Dr. McClaren's testimony destroys a necessary premise of the petitioner's argument and thus the argument itself; counsel could not have performed deficiently by failing to respond to an admission that was not made.

Even had Dr. McClaren, as the petitioner claims, denied being an expert concerning the effects of LSD, counsel would not have performed deficiently by not seeking to exclude his opinion concerning the inconsistency between the petitioner's conduct and insanity under Alabama law.

-30-

Dr. McClaren is a psychologist specializing in forensic psychology, with extensive experience evaluating criminal defendants for insanity and incompetence.  He has been accepted as an expert in forensic psychology in numerous courts, and was so accepted by the trial judge.  (Vol. II, P-1 at R-504-07).  There is, in short, no question but that Dr. McClaren is qualified to render expert opinions concerning insanity, and Dr. McClaren drew on this expertise in formulating and expressing his opinion as to the inconsistency between the petitioner's conduct and insanity under Alabama law.  While "[i]t is error to allow an expert witness to testify outside his area of expertise," *Cook v. Cook*, 396 So. 2d 1037, 1041 (Ala. 1981), Dr. McClaren's area of expertise includes insanity, and his opinion was confined to that area.  That (were it the case) Dr. McClaren was ignorant of how LSD might affect a person's ability to recognize the wrongfulness of his conduct, while leaving intact his ability to act purposefully, could render his opinion on insanity less persuasive, but it would not render him incompetent to express his opinion.  *Parris v. State*, 885 So. 2d 813, 840 (Ala. Crim. App. 2001) ("'[A]ny objection to an expert witness on the ground that he or she lacks knowledge goes to the weight rather than to the admissibility of his or her testimony.'") (quoting *Smoot v. State*, 520 So. 2d 182, 189 (Ala. Crim. App. 1987)).

Because Dr. McClaren was entitled to present an opinion as to the petitioner's ability to appreciate the wrongfulness of his conduct despite any gaps in his awareness of the possible effects of LSD, a challenge to his testimony would have been futile, and counsel does not provide ineffective assistance in failing to assert a meritless issue. *Bolender*, 16 F.3d at 1573.

The petitioner raised this claim in state court, and the Court of Criminal Appeals adjudicated it on its merits.  The state court found that the petitioner failed to show that Dr. McClaren was incompetent to render his opinions and concluded that counsel did not perform deficiently in failing to challenge his competence.  (Vol. IX, P-26 at 24-26).  The petitioner objects that the state court's ruling is incompatible with *Wiggins* because "there

could be no justification for a failure to challenge admittedly incompetent expert testimony." (Doc. 11 at 65). As discussed above, however, Dr. McClaren did not admit that he was incompetent to testify, and the record demonstrates that he was in fact competent to testify. The petitioner has thus failed to carry his burden under Section 2254(d).

In summary, the petitioner has failed to show that counsel performed deficiently in not challenging Dr. McClaren's competence to testify as an expert concerning the inconsistency between his conduct and insanity or that he was prejudiced by the failure to raise such a challenge. The petitioner is thus not entitled to relief on this ground.

## IV.  Unconstitutional and Ineffectively Challenged Jury Charges.

In pertinent part, the trial court charged the jury as follows:

> Now the defendant has suggested in argument that on account of an alleged voluntary intoxication the defendant was unable to form a specific intent to kill or to engage in a course of conduct. This contention is separate from the defendant's plea that he is not guilty by reason of a mental disease or defect. ... I charge you that insanity is a complete defense to a crime. Voluntary intoxication is not a defense, but may in extreme cases negate the requisite intent to commit a specific crime and therefore reduce the grade of the offense. ... Intoxication is not a defense to a criminal charge; however, intoxication is admissible in evidence whenever it is relevant to negate an element of the offense charged. ... An intoxication itself does not constitute a mental disease or defect within the meaning of the statutes concerning that defense. ... An element of intentional murder is the specific intent to kill. ... Mere drunkenness or intoxication voluntarily produced is never a defense to a criminal charge and can never reduce the grade of an offense unless it is so extreme as to render the accused incapable of performing [sic] or entertaining the design to take life. *The degree of intoxication necessary to negate specific intent and thus reduce the charge must amount to insanity.*

(Vol. II, P-1 at R-595-98 (emphasis added)).

> *Voluntary intoxication is not a defense to a criminal charge unless the degree of intoxication amounts to insanity* and renders the accused

-32-

> incapable of forming the requisite intent.  Voluntary intoxication can
> never reduce the grade of a crime unless it is so extreme as to render
> impossible some mental condition which is an essential element of the
> criminal act.  In other words, the intoxication must be so excessive as to
> paralyze the mental facilities and render the accused incapable of forming
> or entertaining the required intent.

(*Id.* at 598-99 (emphasis added)).

> The defense of not guilty by reason of insanity is set out as follows by our
> legislature and the criminal code of this State.  It is an affirmative defense
> to a prosecution for any crime that at the time of the commission of the acts
> constituting the offense the defendant as a result of severe mental disease or
> defect was unable to appreciate the nature and quality or wrongfulness of his
> acts. ...  *The defendant has the burden of proving the defense of insanity by
> clear and convincing evidence*.

(Vol. III, P-1 at R-602-03 (emphasis added)).

> By law every person over the age of fourteen is presumed to be responsible
> for his or her acts.  That is to say that *every person over that age is presumed
> to have sufficient mental capacity to appreciate that certain types of conduct
> are criminal or are acts which are against the law.*  Thus this presumption is a
> fact in the case which must be considered by the jury along with all other
> evidence.

(*Id.* at 603-04 (emphasis added)).

The petitioner argues that the jury charges unconstitutionally shifted to him the burden of proof concerning his intent, and that trial counsel were ineffective in failing to object to the charges on this ground.  (Doc. 11 at 65-66).  The federal petition does not articulate how the charges accomplish this shift, but the amended Rule 32 petition explains the italicized portions of the charge as follows: "The jury instructions ... stated that intoxication can negate the requisite state of mind only if it constitutes 'insanity,' and that Mr. Williams bore the burden of proving insanity by clear and convincing evidence (and indeed, that on this issue he had to overcome a presumption that he was responsible for his acts), thereby shifting to him the State's burden ...."  (Vol. VIII, P-13 at 3).

The respondent argues that this issue was addressed and decided by the trial and appellate courts in the Rule 32 proceedings, (Doc. 16 at 55-58), but the Court cannot

agree.  The Rule 32 petition raised two issues concerning the jury charges on insanity and intoxication: first, that they shifted the burden of proof, and second, that they "contained other contradictions and confusions."  (Vol. VIII, P-13 at 19-20).  The trial court ruled only on the latter challenge, holding that the petitioner "failed to prove that the trial court's jury instructions on insanity and intoxication were contradictory and confusing," and that the charges "correctly stated the law in Alabama."  (Vol. VIII, P-17 at 25-28).  The appellate court likewise addressed only the claim that the charges on insanity were "contradictory and confusing."  (Vol. IX, P-26 at 17-18).  The respondent itself confines its discussion to the "contradictory and confusing" claim, (Doc. 16 at 55-56), even after the petitioner pointed out that the state court ignored his burden-shifting claim.  (Doc. 11 at 65-66).

While, in order to implicate the deference afforded by Section 2254(d), the state court need not provide an express explanation of its *reasons* for rejecting a constitutional claim, it must in fact have reached and adjudicated the claim, and have done so on its merits.  *E.g., Peoples v. Campbell*, 377 F.3d 1208, 1227 (11th Cir. 2004).  The fact of adjudication can be demonstrated by an overt discussion of the claim, by a summary rejection of all claims not specifically addressed, *id.*, or by a summary affirmance, at least absent the parties' denial that the issue was decided.  *Wright v. Secretary, Department of Corrections,* 278 F.3d 1245, 1253-54 (11th Cir. 2002).

None of these circumstances is present here, nor is there an alternative basis for concluding that the state courts adjudicated the burden-shifting claim on its merits.  On the contrary, by identifying the petitioner's challenge to the jury charges solely as one to their allegedly contradictory and confusing nature, the state courts demonstrated they were unaware that a constitutional, burden-shifting claim had also been asserted, and the Court is unable to conclude that the state courts adjudicated a claim they did not realize existed.  *See Wright*, 278 F.3d at 1254 ("[N]o deference was due the state court's decision of the federal constitutional issue for the simple reason that the state court probably had

not decided it.") (explaining *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001)).  The Court thus considers the petitioner's claim de novo.  *Romine*, 253 F.3d at 1365.

The petitioner does not flesh out his legal argument in his federal petition, which merely states the obvious — that the state bears the burden of proving each element of an offense, including intent.  (Doc. 11 at 65-66).  In his post-hearing brief in support of his Rule 32 petition, the petitioner explained that a jury charge invoking a presumption may unconstitutionally shift the burden of proof to the defendant, and he cited in support *Sandstrom v. Montana*, 442 U.S. 510 (1979); *Dick v. Kemp*, 833 F.2d 1448 (11th Cir. 1987); and *Thomas v. Kemp*, 800 F.2d 1024 (11th Cir. 1986).   (Vol. XI, P-36 at OR-368).  The presumptions at issue in those cases, however, directly addressed intent.[22]  The presumption invoked in this case addressed only sanity:  that a person is presumed to possess sufficient mental capacity to appreciate that his conduct is wrongful.  Alabama accepts the presumption of sanity, *e.g., Archie v. State*, 875 So. 2d 336, 341 (Ala. Crim. App. 2003), and such a presumption is both universal and constitutional.  *Clark v. Arizona*, 126 S. Ct. 2709, 2729-30, 2732 (2006); *Fulghum v. Ford*, 850 F.2d 1529, 1533 (11th Cir. 1988).  The petitioner does not argue otherwise.

Instead, he argues that, by placing on him the burden to prove insanity (as a complete defense) by clear and convincing evidence — a burden heightened by the presumption of sanity — and by informing the jury that only intoxication amounting to insanity could negate his intent, the charges somehow "suggest[ed] that [the petitioner] bore the burden to prove that he lacked the requisite mental state, and that he could be presumed to intend his conduct ...."  (Vol. XI, P-36 at OR-368-69).

The jury charges explicitly placed the burden on the state to prove beyond a

---

[22] *See Sandstrom*, 442 U.S. at 513 ("The law presumes that a person intends the ordinary consequences of his voluntary acts."); *Dick*, 833 F.2d at 1450-51 ("A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts ...."); *Thomas*, 800 F.2d at 1026 (same).

reasonable doubt that the petitioner possessed the requisite intent.[23]  The petitioner does not articulate how the language he cites could have effected a transfer of that burden, and it plainly did not do so.  Rather, the charges simply explained that a sufficiently extreme intoxication (amounting to insanity) could negate any intent to kill otherwise shown by the state's evidence.  Presenting evidence in opposition to the prosecution's evidence and thereby introducing a reasonable doubt as to the existence of an element of the offense is an option typically available to a defendant,[24] but the extension of this opportunity scarcely shifts to the defendant the burden of proof concerning the element, even if his failure to satisfactorily exercise the option results in the absence of reasonable doubt.  Nor can the presumption of sanity be construed as a presumption that the petitioner intended to kill, because it is merely "a presumption that a defendant has the *capacity* to form the mens rea necessary for a verdict of guilt," *Clark*, 126 S.Ct. at 2729-30 (emphasis added), not a presumption that he in fact formed the necessary intent.

Because the petitioner's burden-shifting challenge to the jury charges is meritless, trial counsel could not have provided ineffective assistance by failing to raise the issue. *Bolender*, 16 F.3d at 1573.  The petitioner is thus not entitled to relief on this ground.

## V.  Ineffective Assistance - Capital Murder.

Murder of itself is not a capital offense, but murder committed under certain circumstances is.  The indictment charged capital murder two ways: (1) murder "during a

---

[23]"So it is required that the State prove that the defendant shot Linda Barber and Freddie Barber with a gun, that in so doing he killed them, and that in so doing he acted with the intent to cause their death.  Intent is defined by the law as being proved when it is established beyond a reasonable doubt that one's purpose was to cause that result." (Vol. II, P-1 at 589-90).

[24]*E.g., Clark*, 126 S. Ct. at 2730 ("[E]vidence showing incapacity to form the guilty state of mind ... qualifies the probative force of other evidence, which considered alone indicates that the defendant actually formed the guilty state of mind.").

robbery in the first degree"[25] and murder "wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct."  Ala. Code § 13A-5-40(a)(2), (10).  The petitioner argues that the evidence was insufficient to establish either circumstance and that counsel were ineffective in failing to so argue.  (Doc. 11 at 71-72).

Capital murder based on robbery concerned the taking of the Barbers' minivan after the killing of Freddie and Linda Barber.  The petitioner correctly notes the proposition that "a taking of property committed after a murder and as a 'mere afterthought' and unrelated to the murder will not sustain a conviction ... for the capital offense of robbery-murder ...,"[26] but he identifies no evidence to support application of that principle here.   On the contrary, mere moments before killing the Barbers, the petitioner had demanded of Mrs. Paravicini her car keys; struck her when she did not immediately comply; demanded that Billedeaua surrender his vehicle; and fired at him when he ran off with the keys.  There was thus strong evidence that, when Mrs. Barber opened the door and he shot her and her husband in quick succession, the petitioner had formed the intent to steal the minivan.

The petitioner also argues there was "considerable evidence" that his theft of the minivan was "the product of his confused mental state [caused by intoxication], which had fixated on the emergency need for a car to help Mr. Paravicini."  (Doc. 11 at 22, 72).  He does not explain how his allegedly good motive for stealing the vehicle detracts from the substantial evidence that he had formed the intent to steal when he killed the Barbers.  Nor does he explain how his driving off without attempting to assist Mr. Paravicini is consistent with a "fixat[ion]" on helping him.

---

[25]The term "during" as used in Section 13A-5-40(a)(2) means "in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony."  Ala. Code § 13A-5-39(a)(2).

[26]*Ex parte Roberts*, 735 So. 2d 1270, 1276 (Ala. 1999).

"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." *Edwards v. City of Fairhope*, 945 So. 2d 479, 483 (Ala.Crim. App. 2006) (internal quotes omitted). Under this standard, there was unquestionably sufficient evidence from which a rational jury could have found the petitioner to have murdered the Barbers "in the course of or in connection with" a robbery.

Capital murder based on the murder of two or more persons pursuant to one scheme or course of conduct implicated all four deaths. The petitioner argues that the evidence was insufficient to establish a "scheme" due to the evidence of his "confused mental state" and because a scheme does not encompass "shootings committed serially but without a premeditated plan." (Doc. 11 at 22, 72). Whatever the merits of these assertions — and the petitioner cites no authority to support them — they do not address the sufficiency of the evidence concerning a "course of conduct." The latter phrase certainly encompasses a series of murders committed in tight temporal proximity. *E.g.,* *Ex parte Stephens*, 2006 WL 2089894 at *1, 3(Ala. 2006) (murder of wife and son in their mobile home constituted murder "pursuant to one act or course of conduct"). Because the three Barbers were killed within bare moments of each other, there was more than sufficient evidence to support conviction of murder of two or more persons pursuant to one course of conduct.

Because the evidence was patently sufficient to support conviction on both counts of capital murder, any challenge to the sufficiency of the evidence would have been meritless, and counsel cannot be ineffective for failing to raise a meritless issue. *Bolender*, 16 F.3d at 1573.

The petitioner raised this claim in state court, and the Court of Criminal Appeals adjudicated it on its merits. The Court concluded that the evidence was more than adequate to support conviction of both forms of capital murder, such that counsel could

not have been ineffective in failing to challenge the sufficiency of the evidence.   (Vol. IX, P-26 at 32-33).   The petitioner has not attempted to show that the state court's ruling is due no deference under Section 2254(d) and, as discussed above, that ruling is perfectly sound.

In summary, the petitioner has failed to show that counsel performed deficiently in failing to challenge the sufficiency of the evidence to support conviction of capital murder or that the petitioner was prejudiced by the failure to mount such a challenge. The petitioner is thus not entitled to relief on this ground.

## VI.  Ineffective Assistance - Aggravating Circumstance.

Conviction of capital murder by itself does not result in imposition of the death penalty.  Instead, the state must prove at least one statutory aggravating circumstance beyond a reasonable doubt.  If it does so, the jury must weigh the aggravating circumstance or circumstances against any statutory or non-statutory mitigating circumstances asserted by the defendant and not disproved by the state by a preponderance of the evidence.  Ala. Code § 13A-5-45.

The state relied on two aggravating circumstances: (1) that the capital offense was committed while the defendant was engaged in the commission of a robbery (and a burglary); and (2) that the defendant "knowingly created a great risk of death to many persons."  Ala. Code § 13A-5-49(3), (4).  (Vol. III, P-1 at R-620).   The first aggravating circumstance was established by the petitioner's conviction of capital murder during a robbery, Ala. Code § 13A-5-45(e), and the jury was so instructed.  (Vol. III, P-1 at R-638, 650, 662). The petitioner does not challenge this aggravating circumstance.

The petitioner argues that the second aggravating circumstance could not be satisfied merely because four persons were killed or merely by his conviction of the capital offense of murder of two or more persons pursuant to one scheme or course of conduct, and he argues that trial counsel were ineffective in failing to make these

-39-

objections before the trial court.  (Doc. 11 at 23, 72-74).  The petitioner incorrectly
assumes that the state argued, the jury was charged, and/or the trial court found, that the
state could so easily establish this aggravating circumstance.

The state plainly did not argue that a great risk of death to many persons could be
established simply by proof that the defendant murdered four persons, or by proof that he
did so pursuant to a single scheme or course of conduct.  Instead, it argued that this
aggravating circumstance "is premised on facts already in evidence that [the petitioner]
shot and killed four people, that he shot and wounded two others, and that he shot at but
missed Mr. Billedeaux [sic]."  In closing, the state repeated this theme: "We know he
killed intentionally, willfully, maliciously four people.  We know that he shot Jeff Carr.
We know that he shot Brad Barber."  (Vol. III, P-1 at R-632, 654).

The trial court's statements to the jury at three different points made it abundantly
clear that the state had to prove something beyond multiple murder or the capital
conviction in order to establish the aggravating circumstance.   Prior to the presentation of
evidence at the penalty phase, the court advised the jury pursuant to Section 13A-5-45(e)
that it was "to consider the fact that the capital offense was committed during the
commission of or attempt to commit a robbery as having been proven."  (Vol. III, P-1 at
R-638).  He did not make the same statement with respect to the aggravating
circumstance addressing a great risk of death to many persons, nor did the state request
that he do so.  After the presentation of evidence but before closing arguments, the trial
court repeated that the aggravating circumstance involving robbery was to be considered
as already established, then immediately continued that "[t]he State has also alleged that
the defendant knowingly created a great risk of death to many persons.  The burden is on
the State to prove that alleged aggravating circumstance beyond a reasonable doubt."  (*Id*.
at R-650). The court repeated these instructions about the two aggravating circumstances,
almost verbatim, in its charge to the jury.  (*Id*. at R-662-63).  The very juxtaposition of
the charges concerning the two aggravating circumstances made it pellucidly clear that

-40-

the state had to prove something beyond multiple murder or the capital conviction in order to prove the second aggravating circumstance.

The jury could not possibly have imagined, in light of these clear instructions and the state's argument, that it could find the second aggravating circumstance satisfied based simply on the facts incorporated within its guilty verdict on the capital offense. Likewise, the trial court later found the existence of this aggravating circumstance, not based simply on the four murders, but on the shooting of Jeffrey Carr and Brad Barber, the attempted shooting of Billedeaua, and the beating of Mrs. Paravicini. (Vol. III, P-1 at OR-8).

Trial counsel could not have performed deficiently by failing to challenge a position that was never taken by the state or the court, and the petitioner could not have been prejudiced by trial counsel's failure to raise such a meritless challenge. *Bolender*, 16 F.3d at 1573.

The petitioner raised this claim in state court, and the Court of Criminal Appeals adjudicated it on its merits. The appellate court found that the trial court relied on numerous factors beyond the capital murder conviction in finding the aggravating circumstance. (Vol. IX, P-26 at 33-35). The petitioner has made no effort to challenge this finding under Section 2254(d) and, as discussed above, it is plainly correct.[27]

---

[27]The petitioner argues only that the appellate court should not have considered his firing at Billedeaua to support the aggravating circumstance, because the state argued at trial that he aimed at his victims. (Doc. 11 at 74). This argument fails for myriad reasons. First, it is not properly before the Court, because the petitioner did not argue in state court that it would be improper to rely on the Billedeaua shooting in establishing the aggravating circumstance, only that the trial court did not do so. Second, the state did not abandon reliance on this incident expressly or implicitly, because shooting at, but missing, an intended victim still counts in measuring the aggravating circumstance. *E.g., Edwards v. State*, 515 So. 2d 86, 92-93 (Ala. Crim. App. 1987). Third, removing the Billedeaua incident from consideration would still leave the aggravating circumstance satisfied, because the petitioner did not challenge the trial court's reliance on the non-fatal shootings of Jeffrey and Brad. *E.g., Wesley v. State*, 575 So. 2d 108, 121 (Ala. Crim. App. 1989) ("We agree with the trial judge that ... '[t]he number of victims who were

In summary, the petitioner has failed to show that counsel performed deficiently in failing to argue that the aggravating circumstance of great risk of death to many persons cannot be satisfied merely by the fact of conviction of murder of two or more persons pursuant to a scheme or course of conduct, and he has likewise failed to show that he was prejudiced by the failure to make such an argument.  The petitioner is thus not entitled to relief on this ground.

## VII.  Ineffective Assistance - Statutory Mitigating Circumstance.

Among the statutory mitigating circumstances is the following: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."  Ala. Code § 13A-5-51(6).  Trial counsel presented this circumstance to the jury and again to the trial court, basing it on the testimony of Dr. Brown and Dr. McClaren.  (Vol. III, P-1 at R-635, 658, 675, 680-81).  The jury, of course, left no record of its determination with respect to this circumstance.  The trial court concluded that this mitigating circumstance had been disproved by the state by a preponderance of the evidence.  (*Id.* at OR-7-8).[28]  The petitioner makes three related arguments concerning the trial court's failure to find this mitigating circumstance, all couched in terms of ineffective assistance of counsel.  (Doc. 11 at 66-69).

First, the petitioner argues that the trial court rejected the mitigating circumstance of *substantial* impairment "because a conclusion of *total* impairment had been rejected at trial."  (Doc. 11 at 22 (emphasis in original)).  He continues that this was an incorrect

---

murdered, shot, and shot at by the defendant — seven — is undeniable proof that the defendant created a great risk of death to many persons.'"), *rev'd on other grounds*, 575 So. 2d 127 (Ala. 1990).

[28]The trial court accepted the other mitigating circumstances presented by the petitioner, based on his age, lack of significant criminal history, and deprived childhood. (*Id.*).

basis for rejecting the mitigating circumstance, because "'his burden of proving, as a mitigating circumstance, the impairment of his capacity to appreciate the criminality of his conduct was substantially lighter'" than showing a jury he was intoxicated to the point of insanity.  (Doc. 11 at 67 (quoting *Davis v. State*, 740 So. 2d 1115, 1129 (Ala. Crim. App. 1998), *aff'd*, 740 So. 2d 1135 (Ala. 1999)).  He concludes that trial and appellate counsel were ineffective because they did not "marshal and effectively present such controlling authorities on mitigation."  (*Id*. at 69).

There are multiple difficulties with this argument.  First, the trial court did not purport to reject the mitigating circumstance simply because the jury had found the petitioner possessed the requisite intent despite intoxication.  While the court noted that the separate issue of mental disease or defect "was resolved adversely to [the petitioner] by the jury," in rejecting the mitigating circumstance he stated as follows: "Considering *all* of the evidence material to the issue, the Court finds that the existence of this mitigating circumstance has been disproved by the State by a preponderance of the evidence."  (Vol. III, P-1 at OR-7 (emphasis added)).  Given the trial court's statement that it considered all the evidence concerning the petitioner's impairment, there is no basis other than speculation for assuming that the court did not in fact weigh all the evidence but instead reflexively rejected the mitigating circumstance based solely on the jury's decision.

Even had the trial court ruled on the basis the petitioner assumes, his doing so would not have contradicted Alabama law.  When his case was tried, state law was quite clear that "voluntary intoxication would not constitute the mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, for purposes of a capital sentencing proceeding, where the defendant did not show that he was so intoxicated as to render himself *incapable* of appreciating his conduct."  *Keunzel v. State*, 577 So. 2d 474, 522 (Ala. Crim. App. 1990) (emphasis added); *accord Jenkins v. State*,

627 So. 2d 1034, 1052 (Ala. Crim. App. 1992); *Bankhead v. State*, 585 So. 2d 97, 108 (Ala. Crim. App. 1989); *Thompson v. State*, 503 So. 2d 871, 881 (Ala. Crim. App. 1986). The same principle has been applied repeatedly since the petitioner's trial, including in this case. *Hodges v. State*, 856 So. 2d 875, 932 (Ala. Crim. App. 2001); *Ferguson v. State*, 814 So. 2d 925, 964 (Ala. Crim. App. 2000); *McWhorter v. State*, 781 So. 2d 257, 307-08 (Ala. Crim. App. 1999); *Williams v. State*, 710 So. 2d 1276, 1346 (Ala. Crim. App. 1996). Under this line of cases, when the mitigating circumstance of substantial impairment is based on intoxication, the degree of impairment must be total, rendering the defendant "incapable" of appreciating his conduct. By finding that the petitioner had the requisite intent to kill despite intoxication, the  jury necessarily found beyond a reasonable doubt that the petitioner was capable of appreciating the nature and quality or wrongfulness of his acts.   Such a finding beyond a reasonable doubt compels a similar finding by the preponderance-of-the-evidence standard applicable at sentencing.

The petitioner ignores this wealth of authority in favor of *Davis*, but that case was decided in 1998 — long after the petitioner's trial — and it relies only on cases that did not involve intoxication. *See Ivery v. State*, 686 So. 2d 495 (Ala. Crim. App. 1996); *Lewis v. State*, 380 So. 2d 970 (Ala. Crim. App. 1979); *Whisenhant v. State*, 370 So. 2d 1080 (Ala. Crim. App. 1979). Whether or not *Davis* represents current  Alabama law,[29] it did not constitute state law in 1992.

Because the trial court did not employ a more stringent standard of impairment than state law provides, the objection that counsel did not raise was meritless, and thus they could not have been ineffective in failing to raise it. *Bolender*, 16 F.3d at 1573.

As his second argument, the petitioner notes that the trial court and jury "[can]not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers

---

[29]It apparently has never been cited for the proposition for which the petitioner employs it.

as a basis for a sentence less than death," *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (emphasis in original) (internal quotes omitted), and he insists that counsel should have pointed out to the state court that it could not constitutionally refuse to consider the issue of substantial impairment as a mitigating factor.  (Doc. 11 at 68).  The trial court, however, *did* consider this mitigating circumstance.  The objection that counsel did not raise was thus meritless, and they could not have been ineffective in failing to raise it. *Bolender*, 16 F.3d at 1573.[30]

Finally, the petitioner argues that counsel were ineffective because they failed to point out to the trial and appellate courts the case of *Hadley v. State*, 575 So. 2d 145 (Ala. Crim. App. 1990).  That case, he says, held on facts indistinguishable from those in this case that the trial court was required to find the mitigating circumstance of substantial impairment.  (Doc. 11 at 68-69).

"In *Hadley* there was uncontroverted evidence that the defendant was heavily intoxicated at the time of the offense, that he had a very low intelligence, that he suffered from a number of specific psychoses, and that he had engaged in bizarre behavior on the day of the offense."  *Simmons v. State*, 797 So. 2d 1134, 1182 (Ala. Crim. App. 1999). There was uncontested forensic evidence in *Hadley* that the defendant's blood alcohol level was .173% some time after the shooting, translating into a level of approximately .20% when the shooting occurred.  575 So. 2d at 149-50, 157.  The defendant's bizarre, pre-offense behavior included attempting to shoot a dog because it bit a child's hand while eating the child's sandwich; repeatedly threatening to commit suicide; deliberately hitting himself on the head with a pipe wrench; and preaching to people in a pool hall.  *Id.* at 147-48.  In this case, there was no forensic evidence of the petitioner's degree of intoxication, nor was there any evidence that the petitioner had acted peculiarly in any

---

[30]The petitioner does not argue that the trial court refused to consider evidence of his intoxication, and the trial court plainly did so, even relying on it in finding the mitigating circumstance of being under the influence of extreme mental or emotional disturbance.  (Vol. III, P-1 at OR-8).

-45-

way before the killings occurred.  Moreover, as in *Simmons*, here "[c]onflicting evidence was presented on [the petitioner's] mental health and his ability to appreciate the criminality of his conduct."  797 So. 2d at 1182-83.  While there are certain similarities between *Hadley* and this case, there are sufficient differences that it cannot be said to dictate application of the substantial impairment mitigating circumstance here.

Indeed, the Court of Criminal Appeals has already held that *Hadley* does not control this case, (Vol. IX, P-26 at 29), and this Court does not sit in judgment of state court interpretations of its own decisions.  *E.g., Alvord v. Wainwright*, 725 F.2d 1282, 1291-92 (11th Cir. 1984) (because "the validity of the claim that [the petitioner's] counsel failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law," the Florida appellate court's ruling on collateral attack that state law defeated the unasserted claim meant that the petitioner "has failed to demonstrate with respect to this issue that his counsel rendered ineffective assistance"); *accord Duest v. Singletary*, 967 F.2d 472, 477 (11th Cir. 1992).

Even if it could be argued that the state court in this case incorrectly construed *Hadley*, "mere errors of state law are not the concern of this Court, unless they rise for some reason to the level of a denial of rights protected by the United States Constitution."  *Wainwright v. Goode*, 464 U.S. 78, 86 (1983).  The petitioner does not argue that any error in the state court's interpretation of *Hadley* was of constitutional dimension.  That court's ruling therefore establishes that the petitioner's invocation of *Hadley* is meritless, and thus counsel could not have been ineffective in failing to raise the issue.  *Bolender*, 16 F.3d at 1573.

The petitioner raised this claim in state court, and the Court of Criminal Appeals adjudicated it on its merits.  The court held that *Hadley* does not control and that counsel did not perform deficiently in their presentation of the substantial impairment mitigating circumstance.  (Vol. IX, P-26 at 27-30).  As noted, the petitioner does not contest the court's interpretation of *Hadley* on constitutional grounds, so it is immune from federal

review.  Instead, the petitioner argues that the failure of counsel to argue *Davis*, *Eddings* and *Hadley* was the product of an unreasonable investigation under *Wiggins*.  (Doc. 11 at 69).  Because *Davis* did not exist, *Hadley* did not apply, and *Eddings* was followed, counsel could not have performed deficiently by failing to raise these cases, and the petitioner could not have been prejudiced by the failure.  The state court's ruling was neither contrary to nor an unreasonable application of *Wiggins*, and thus its ruling must stand.

In summary, the petitioner has failed to show that counsel performed deficiently in pursuing the mitigating circumstance of substantial impairment, and he has likewise failed to show that he was prejudiced by counsel's failure to make additional arguments. The petitioner is thus not entitled to relief on this ground.

## VIII.  Ineffective Assistance - Non-Statutory Mitigation Witnesses.

At the penalty phase, trial counsel presented testimony from the petitioner, his ex-wife, and his mother.  (Vol. III, P-1 at R-639-49).   At the Rule 32 hearing, the petitioner presented testimony from four individuals that had employed the petitioner and/or known him as a child, none of whom was contacted by trial counsel.  (Vol. VIII, P-15 at R-70-110).  The petitioner argues that trial counsel were ineffective in failing to investigate and present these witnesses.  (Doc. 11 at 69-71).

One witness recalled the petitioner attending church with his adoptive parents, participating in church work parties, and playing with the witness's children.  The petitioner was always polite and respectful when playing at the witness's house.  The petitioner stopped coming to the witness's house around age thirteen (about ten years before the murders).  (Vol. VIII, P-15 at R-95-102).

A second witness was a childhood friend, who recalled that other children made fun of the petitioner because of his poverty and his teeth, from which interactions the petitioner would always back away.  The witness had no contact with the petitioner after

-47-

ninth grade (about seven years before the murders).  (Vol. VIII, P-15 at R-103-10).

A third witness met the petitioner when he was two or three years old.  The petitioner sang in the church choir.  As a teenager, he performed yard work and odd jobs for the witness in connection with his business maintaining cemetery plots.  The petitioner was dependable, polite, and a hard worker, good enough that the witness would hire him back if he was still the same.  The petitioner stopped working for the witness by age eighteen (about five years before the murders).  The witness knows by reputation that the petitioner got rough, got out of hand, and was using dope, but he would have taken in the petitioner in 1992 if he'd had room.  (Vol. VIII, P-15 at R-70-86).

The final witness employed the petitioner in building above-ground swimming pools.  The petitioner was a good worker, honest, and never showed up intoxicated.  He is in the fifteen or twenty per cent of former employees the witness would hire again.  The petitioner stopped working for the witness about two years before the murders occurred. (Vol. VIII, P-15 at R-87-94).

"No absolute duty exists to introduce mitigating or character evidence."  *Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000) (en banc).  "[N]or is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy."  *Id.*  "Courts must indulge [the] strong presumption ... that what the particular defense lawyer did at trial — for example, what witnesses he presented or did not present — were acts that some reasonable lawyer might do."  *Id.* at 1314 & n.15 (internal quotes omitted).  "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption."  *Id.* at 1314 n.15.

"Under *Strickland*, counsel's conducting or not conducting an investigation need only be reasonable to fall within the wide range of competent assistance."  *Chandler*, 218 F.3d. at 1317.  "Because the reasonableness of counsel's acts (including what investigations are reasonable) depends critically upon information supplied by the

[petitioner] or the [petitioner's] own statements or actions, evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims." *Id.* at 1318 (internal quotes omitted).

In *Chandler*, the Court held that trial counsel's performance at sentencing was not constitutionally deficient where he focused his efforts on exploiting lingering doubt about the defendant's guilt and presented the defendant's wife and mother in mitigation, and where the defendant offered no evidence that he had informed counsel about any of the 27 witnesses presented at the collateral evidentiary hearing. 218 F.3d at 1319-26. The petitioner can fare no better.[31]

As in *Chandler*, trial counsel focused their efforts at sentencing on the jury's lingering doubt about his culpability. Counsel reminded the jury about the same evidence concerning the petitioner's intoxication, emphasizing his diminished capacity to appreciate or control his conduct and thereby implicating two statutory mitigating circumstances. (Vol. III, P-1 at R-634-35, 658). Focusing on residual doubt rather than character evidence can be a reasonable approach. "Especially when — as in this case — the evidence of guilt was not overwhelming, we expect that petitioners can rarely (if ever) prove a lawyer to be ineffective for relying on this seemingly reasonable strategy to defend his client." *Chandler*, 218 F.3d at 1320. Because counsel can reasonably choose to focus on residual doubt and not character even though such mitigation would not be "incompatible with counsel's strategy," *id.* at 1319, counsel cannot be faulted for not emphasizing both approaches.

As in *Chandler*, trial counsel nevertheless presented the petitioner's ex-wife and mother as mitigation witnesses. As in *Chandler*, "[b]ringing the family's existence and pain to the attention of the jury is powerful in and of itself." 218 F.3d at 1321 n.30.

---

[31]The petitioner ignores *Chandler* in favor of earlier cases, most of which involved a total failure to present mitigating evidence, failure to present mental health evidence, or both. (Doc. 11 at 70). None reflects the facts of this case and, in any event, the en banc opinion in *Chandler* supersedes any contrary positions taken in previous cases.

These witnesses went even further, because they reminded the jury of the broken, disadvantaged life the petitioner had lived.

As in *Chandler*, the petitioner failed to present evidence at the Rule 32 hearing that he had informed counsel about any character witnesses beyond those that testified at sentencing. Because of this failure, "we must assume counsel carried out his professional responsibility and discussed mitigation with his client." 218 F.3d at 1324. And "counsel [is] not ineffective for not investigating witnesses in mitigation when [the] defendant failed to alert counsel to their existence." *Id*. at 1325 n.40.

"Under the prejudice prong of *Strickland*, the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Williams v. Allen*, 458 F.3d 1233, 1245 (11th Cir. 2006) (internal quotes omitted). No such reasonable probability exists here, given the tepidity of the petitioner's evidence. At most, it shows that, before he got mixed up with drugs as a youth, the petitioner was a polite, church-going boy with both friends and harassers and that, for a few years after he began doing drugs, he remained a good worker. None of the witnesses had personal knowledge about the petitioner in the years preceding the murders, and none expressed affection for, or remorse concerning, the petitioner. As in *Gilreath v. Hood*, 234 F.3d 547 (11th Cir. 2000), "[t]he testimony of the character witnesses offered by Petitioner — witnesses who would have testified that Petitioner was generally a good man when sober, was a good worker, and was a good father — seems too weak to have likely changed the outcome of the sentencing." *Id*. at 552-53.

The petitioner raised this claim in state court, and the Court of Criminal Appeals adjudicated it on its merits. The court concluded that, absent evidence to the contrary, it would be presumed that counsel performed a reasonable investigation but that the petitioner failed to advise counsel of the additional witnesses, defeating any claim of deficient performance. (Vol. IX, P-26 at 30-32). The petitioner argues that this ruling

conflicts with *Wiggins*' requirement of a reasonable investigation as a constitutional predicate to a reasonable strategic decision.  (Doc. 11 at 70, 71).  As discussed above, however, the petitioner's failure to present evidence either that counsel did not discuss mitigation with him, or that he advised counsel of these witnesses, requires the courts to presume that the decision not to present additional mitigation witnesses was the result of a constitutionally adequate investigation.  *Chandler*, 218 F.3d at 1324, 1325 n.40.  The state court ruling is compliant with *Wiggins* and must therefore stand.

The state court also concluded that, given the weakness of the proffered mitigation testimony, the petitioner was not prejudiced by the failure to present such evidence.  (Vol. IX, P-26 at 31-32).  The petitioner does not challenge this conclusion, which must therefore be sustained under Section 2254(d) and which is also, as discussed above, plainly correct.

In summary, the petitioner has shown neither that counsel performed deficiently in failing to present additional mitigation witnesses nor that, had the witnesses been presented, there is a reasonable probability that he would not have been sentenced to death.  The petitioner is thus not entitled to relief on this ground.

## IX.  Unconstitutional and Ineffectively Challenged Prosecutorial Misconduct.

The petitioner's allegations of prosecutorial misconduct fall into three categories, all presented both as constitutional violations in their own right and as claims of ineffective assistance.  The Court addresses each category separately.

### A.  Closing Argument.

The primary allegations of prosecutorial misconduct involve closing argument at the penalty phase and include the following: (1) contrasting the rights of the victims to the rights of the petitioner; (2) commenting on the petitioner's future dangerousness; (3) appealing to religious sensibilities; (4) making a claim of duty; and (5) vouching for the

strength of the prosecution's case.  (Doc. 11 at 76).

With respect to a comparison of rights, the language to which the petitioner objects is as follows:[32]

> But I am asking you, please, to think back to the events of the 15th of February.  Start with poor Gerald Paravicini left to die like a dog in the middle of Two-Mile Road.  Right down the street Mrs. Barber, a mail carrier, walked to her door, responded to a knock and literally had her brains blown out.  Her husband who was sitting in the kitchen had the same thing happen to him.  Their son Bryan who was sound asleep in his bed and not a threat to anybody had his brains shredded by hot steel.  So when you think about emotion and you think about weeping, weep for the dead for they are not here to tell us that they are sorry they are not alive.  They are not here to tell us they are sorry they are not here to raise their children.  They are not here to tell us that they are sorry that their families were devastated by the actions of Jason Williams.
> ...
> ... Were these four lives worth one night of dope?  They weren't.  Were these children who lost parents, this wife who lost a husband worth one night of dope?  I would submit to you that to impose a punishment of life without parole would trivialize the crime that he has committed and it would mock the dead. ...
> Whatever you determine his fate to be, please remember he is the master of his own fate, he is the captain of his own soul, he is accountable for whatever he did, and whatever happens to him today you didn't do to him, I didn't do to him, the Judge didn't do to him; he did it to himself. ...

(Vol. III, P-1 at R-653, 655).

With respect to his future dangerousness, the language to which the petitioner objects is as follows:

> But we punish for yet a second reason, and that is to protect good and decent people in their homes and on these streets from the likes of Jason Williams.

(*Id.* at  R-654).

With respect to appealing to religious sensibilities, the language to which the

---

[32]The petitioner identifies the objectionable comments by page number but not line number, so the Court quotes the language that appears to correlate with his objection.

petitioner objects is as follows:

> The death penalty is the only way, ladies and gentlemen, that we as
> Christian civilized people can proclaim in no uncertain terms that the
> most precious of all God's gift [sic] is human life, and if you take human
> life, you forfeit your own right to live.  And if you vote to impose a penalty
> of death in this case, you are not minimizing human life; you are emphasizing
> the sanctity of human life.

(*Id*. at R-655-56).

With respect to a claim of duty and vouching for the strength of the prosecution's

case, the language to which the petitioner objects is as follows:

> And it is up to you — not me, not Mr. Yelverton, not the Judge — to
> decide what you believe your duty is.  And if you come back with verdict
> [sic] of death, nobody is going to applaud, balloons will not go up in this
> courtroom, crepe paper will not decorate the walls.  But one thing will
> happen.  As painful as it might be, we can all walk out of here knowing,
> first of all, that you had the wisdom to see the right and the courage to do
> it.  If the death penalty is not appropriate for killing four people, then
> I can conceive of no situation where it is.  Once to every man and nation
> comes the moment to decide and [sic] the strife of truth with falsehood for
> the good or evil side.  Ladies and gentlemen, it is your call.

(*Id*. at R-662).  The petitioner argues that these comments were unconstitutionally

improper and that trial counsel were thus ineffective in failing to object to them.  (Doc. 11

at 75, 77-78).  The first question, then, is whether the comments were unconstitutional.

> The law relating to prosecutorial argument at the sentencing stage
> of a capital case has been settled in this circuit since four en banc decisions
> on the subject were released in Georgia cases 16 years ago. [citations omitted]
> Under that well-settled law, habeas relief is due to be granted for improper
> prosecutorial argument at sentencing only where there has been a violation
> of due process, and that occurs if, but only if, the improper argument rendered
> the sentencing stage trial fundamentally unfair. [citations omitted]
> An improper prosecutorial argument has rendered a capital sentencing
> proceeding fundamentally unfair if there is a reasonable probability that the
> argument changed the outcome, [citation omitted], which is to say that absent
> the argument the defendant would not have received a death sentence.  A
> reasonable probability is one that is sufficient to undermine confidence in
> the outcome.

*Romine v. Head*, 253 F.3d 1349, 1365-66 (11th Cir. 2001).

To demonstrate the unconstitutionality of the prosecutor's remarks, the petitioner relies on *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated on remand*, 809 F.2d 700 (11th Cir. 1987) (en banc), one of the four cases cited in *Romine*.[33]  Under *Brooks*, remarks about the defendant's future dangerousness if he is not given the death penalty — even remarks more pointed than those at issue here — are proper. *Id*. at 1406, 1411-12 ("Whose daughter will it be next time?").  *Brooks* also teaches that comments personalizing the victim and the survivors (including "compelling" statements that the family will never be together at Thanksgiving), and arguments that the defendant "was responsible for his plight," are entirely proper, *id*. at 1409-10, eliminating the petitioner's "contrasting of rights" protest.

The prosecutor's remarks concerning the jury's duty pale compared with those of the prosecutor in *Davis v. Kemp*, 829 F.2d 1522 (11th Cir. 1987), who argued that "[i]t's your duty and nobody else's you can't delegate it to anyone else.  No one else but you and your duty is clear, and to not find - not recommend the death penalty is to leave your duty undone and only halfway complete in this case."  *Id*. at 1529.  These remarks were deemed proper because they simply "emphasized the responsibility of the jury" and "argue[d] that the jury should return a verdict of death in this particular case."  *Id*. at 1529-30.  In light of *Davis*, the remarks challenged here cannot be construed as improper.

The Court cannot discern any "vouch[ing] for the strength of the case against" the petitioner, (Doc. 11 at 76), and  "ambiguous ... remarks must be viewed with lenity."  *Brooks*, 762 F.2d at 1400.  Nor is it clear that expressing confidence in the state's case as presented to the jury (as opposed to vouching for the truthfulness of government

---

[33]Only one of the petitioner's other authorities addresses remarks by the prosecutor, and it deals only with remarks leading the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985).

witnesses) could be improper.  At any rate, indicating to the jury that a recommendation of death is the "right" result — which is the closest to vouching the Court can distill from the challenged passage — constitutes nothing more than a request for such a recommendation, and "[i]t certainly was not improper for the prosecutor to argue that the jury should return a verdict in this particular case."  *Davis*, 829 F.2d at 1530.

As for appealing to religious sensibilities, this is not a case like *Romine*, in which the prosecutor repeatedly insisted that the biblical punishment for patricide is death and should thus be imposed.  253 F.3d at 1360-61.  Nor is it like *Cobb v. Wainwright*, 609 F.2d 754 (5th Cir. 1980), in which the prosecutor told the jury that there was no biblical basis for showing the defendants mercy.  *Id*. at 755 n.2.  The prosecutors in those cases argued or insinuated that scriptural teaching foreclosed any penalty less than death.  The prosecutor here, in contrast, argued generally that Christianity is not incompatible with imposition of the death penalty, without stating that religion cried out for that penalty in this case.  The Court does not hold that the comment was proper, but not all religious references are of the same intensity, and the one at issue here ranks closer to the mild end of the scale than those in the cited cases.

In summary, all but one of the challenged comments were in fact proper under governing law, and "[a] permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional."  *Brooks*, 762 F.2d at 1403.  The question becomes whether a single sentence referencing God and Christian people "rendered the sentencing fundamentally unfair," that is, "whether there is a reasonable probability that, but for th[at] argumen[t], the death verdict would not have been given."  *Id*. at 1413.  This review must be undertaken "in the context of the entire proceeding," *id*., including the response of defense counsel.  *Id*. at 1416 (looking to the "mitigat[ing]" effect of defense argument); *accord Romine*, 253 F.3d at 1369 ("It can make a difference if the improper argument ... was followed by defense argument which ameliorated the error .....").

As noted, the challenged comment was not inflammatory.  Moreover, defense

counsel seized the opportunity the remark provided and turned it on its head, announcing that "[w]e as Christian civilized people are not required to kill others amongst us" and arguing that the biblical injunction not to kill applies to the imposition of capital punishment.  (Vol. III at R-656, 659).  Given these circumstances, as well as the strength of the state's case, there is no reasonable probability that, had the challenged comment not been made, the jury would not have recommended death and the trial court would not have imposed it.  *Cf. Mills v. Singletary*, 63 F.3d 999, 1029 (11th Cir. 1995) (given the strength of the aggravating circumstances, defense counsel's response to the improper argument, and the court's instruction to the jury, there was no reasonable probability that the jury would not have recommended death had the objectionable comment not been made).  Accordingly, there was no constitutional violation.

The explicit premise of the petitioner's ineffective assistance claim is that counsel should have objected because the comments were unconstitutional.  Because the comments were not unconstitutional — and because the same prejudice standard governs the analysis of both constitutionality and ineffective assistance —  his ineffective assistance claim necessarily fails.

The petitioner raised this claim in state court, and the Court of Criminal Appeals adjudicated it on its merits.  The court concluded that the remarks were not improper (under a plain error standard of review), that the petitioner failed to rebut the presumption that counsel had valid strategic reasons for not objecting to any impropriety in the remarks, and that counsel failed to show that, but for the remarks, he would not have been sentenced to death.  (Vol. IX, P-26 at 36-38).  The petitioner complains that the actual constitutionality vel non of the comments cannot be determined using a plain error standard.  (Doc. 11 at 77-78).  The Court's discussion above, however, demonstrates that the comments were not unconstitutional under a de novo standard of review.  The petitioner fails to address the state court's rulings concerning deficient performance and prejudice, which therefore must stand under Section 2254(d).  As the foregoing

-56-

discussion demonstrates, these rulings were plainly correct.

In summary, the prosecutor's closing argument was proper in almost all respects, and counsel could not have performed deficiently, or prejudiced the petitioner, by failing to challenge proper argument. The single questionable remark, even if improper, did not render the sentencing proceeding unconstitutionally unfair. Moreover, the presumption of non-deficient performance was not challenged by the petitioner, and the record affirmatively reflects that counsel had a strategic reason for not objecting to the questionable comment (in order to invoke the Bible against capital punishment). Finally, the petitioner was not prejudiced by the remark, since there is no reasonable probability that, had it not been made, he would not have been sentenced to death. The petitioner is thus not entitled to relief on this ground.

### B.  Crime Scene Photographs.

The petitioner argues that the state's introduction of "gruesome" photographs of the victims and their wounds unconstitutionally inflamed the jury's passions, with the damage worsened by the prosecutor's encouragement to the jury before sentencing "to look at them because if there is a time to weep those for whom we should weep are those who have gone to their great reward."  (Vol. III, P-1 at R-655).  (Doc. 11 at 76).

> We review state court evidentiary rulings on a petition for habeas corpus to determine only whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial.  ...  Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a crucial, critical, highly significant factor in the [defendant's] conviction. ...  The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair.

*Jacobs v. Singletary*, 952 F.2d 1282, 1296 (11th Cir. 1992) (citations omitted); *accord Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989).

> Generally, photographs are admissible into evidence in a criminal prosecution if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to

> corroborate or disprove some other evidence offered or to be offered, and
> their admission is within the sound discretion of the trial judge. ...
> Photographic exhibits are admissible even though they may be cumulative,
> demonstrative of undisputed facts, or gruesome. ...  In addition,
> photographic evidence, if relevant, is admissible even if it has a tendency
> to inflame the minds of the jurors. ...  [A]utopsy photographs depicting
> the character and location of wounds on a victim's body are admissible
> even if they are gruesome, cumulative, or relate to an undisputed matter.

*Brooks v. State*, 2007 WL 625020 at *7 (Ala. Crim. App. 2007) (citations and internal

quotes omitted).  These propositions predate the petitioner's trial.  *Id.* (citing cases);

*Duren v. State*, 590 So. 2d 360, 364 (Ala. Crim. App. 1990).  Although the petitioner

ignores the threshold question of whether the photographs were "[e]rroneously admitted,"

*Brooks* and its antecedents make plain that the photographs were properly admissible

under Alabama law.  Given the defenses of insanity/intoxication, the state was entitled to

demonstrate the petitioner's appreciation of his conduct by the precise targeting of the

victims (mostly head shots, and always two shots) and the close range from which the

victims were dispatched (leaving stipple).

Even had the photographs been erroneously admitted, the petitioner has not

attempted to show that they were a "crucial, critical or highly significant factor" in his

conviction or sentence.  Indeed, there is no evidence that the jury or the trial court gave

the photographs any consideration whatsoever.  Given the strong evidence of guilt and of

aggravating circumstances and the modest evidence of mitigating circumstances, the

photographs plainly were not significant to the outcome and thus their admission could

not constitute a constitutional violation.

The petitioner does not include the prosecutor's reference to the photographs in his

closing as an instance of improper jury argument.  (Doc. 11 at 76).[34]  Instead, he agues

---

[34]The prosecutor referred to weeping because the petitioner had just left the witness
stand in tears — and continued to cry during the prosecution's closing —  and the
prosecutor wanted to redirect the jury's focus.  (Vol. III, P-1 at R-652-53, 655, 657, 660).
Defense counsel emphasized the petitioner's tears in his closing, (*id.* at R-657, 660), and

-58-

that the reference invited the jury to review the photographs, with it being "[t]he cumulative impact of these photographs" themselves that was unconstitutional. (*Id.*). Because the introduction of the photographs was not improper and did not render the sentencing fundamentally unfair, referring to them in closing could not do so.

The petitioner challenged the constitutionality of the photographs on direct appeal, (Vol. V, P-2 at 165-66), and the Court of Criminal Appeals adjudicated the claim, ruling that the photographs were properly admissible under state law and that they did not violate the petitioner's due process rights. 710 So. 2d at 1326-27. The petitioner has not attempted to impugn these rulings under Section 2254(d) and, as discussed above, any such effort would be futile; the court's ruling on admissibility is one of state law only, and its constitutional ruling is plainly correct.

The Court need not reach the merits of the petitioner's ineffective assistance claim concerning the photographs, because he did not raise this claim in his Rule 32 proceedings, and it is therefore unexhausted. *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) ("In order to be exhausted, a federal claim must be fairly presented to the state courts."); *LeCroy v. Secretary, Department of Corrections*, 421 F.3d 1237, 1260 n.3 (11th Cir. 2005) ("We conclude that the substantive claim ... is separate and distinct from an ineffective-assistance-of-counsel claim based on the failure to object to, or appeal, [the substantive violation]. Thus, this claim was not fairly presented to the state courts."). Moreover, it is plain that it is too late for him to exhaust his state remedy. *See* Ala. R. Crim. P. 32.2(d) ("In no event can relief be granted on a claim of ineffective assistance of trial or appellate counsel raised in a successive petition.").

"It is well established that when a petitioner has failed to exhaust his claim by

---

the trial court twice instructed the jury to avoid any "influence of passion" in reaching their decision. (*Id.* at R-664). Had the petitioner challenged the remark as improper jury argument, under the analysis explained in Part IX.A the remark, even if improper, did not render the sentencing fundamentally unfair, whether considered alone or in conjunction with the passages the petitioner did challenge.

failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar." *McNair*, 416 F.3d at 1305.  A petitioner can pursue a procedurally defaulted claim in federal court only if he shows either cause for the default and actual prejudice therefrom or a fundamental miscarriage of justice, which arises when a constitutional violation has probably resulted in the conviction of one actually innocent.  *E.g., Davis v. Terry*, 465 F.3d 1249, 1253 n.4 (11th Cir. 2006).  The petitioner neither challenges these propositions nor attempts to surmount his procedural default.

It is true that the respondent has asserted neither a failure to exhaust nor a resulting procedural default.  (Doc. 16 at 93-117).  However, waiver of these issues cannot occur by silence but only by counsel's express waiver.  *McNair*, 416 F.3d at 1304-06 (construing 28 U.S.C. § 2254(b)(3)).  Because the respondent has not expressly waived these issues, the Court is required to dismiss this ineffective assistance claim sua sponte. *Id*. at 1306.[35]

Even were the Court to reach the merits of the petitioner's ineffective assistance claim,[36] it would fail.  Because, as with his challenge to closing argument, the explicit premise of the petitioner's ineffective assistance claim is that the prosecutor's use of the photographs was unconstitutional, the constitutionality of the prosecution's use of the photographs, as shown above, is fatal to his ineffective assistance claim.

In summary, the prosecutor's use of the photographs was both proper under state law and constitutional.  The petitioner's claim of ineffective assistance is procedurally

---

[35]Ordinarily, a court is required to dismiss a petition that contains both exhausted and unexhausted claims, to allow the petitioner to exhaust his state remedies.  When the unexhausted claim is procedurally barred, however, the court need not do so.  *E.g., Kelley v. Secretary, Department of Corrections*, 377 F.3d 1317, 1351 (11th Cir. 2004).

[36]"An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

defaulted and, at any rate, the propriety and constitutionality of the photographs demonstrates that counsel did not perform deficiently and that there is no reasonable probability that, but for the photographs, the petitioner would not have been sentenced to death.  The petitioner is thus not entitled to relief on this ground.

### C.  Pre-Trial Misconduct.

The remaining allegations of prosecutorial misconduct are that the state: (1) "lied" to the petitioner by "suggest[ing]" he would not receive the death penalty if he turned himself in; and (2) "coerced" Ellzey into testifying before the grand jury.  (Doc. 11 at 77).

The short answer to the claim concerning the petitioner is that it was adjudicated on the merits by the Court of Criminal Appeals on direct appeal.  The state court found that "the record shows that the appellant's surrender was not in fact coerced or induced by any statement by an officer or by any reasonable assumption the appellant may have made from any such statement" and that "he had clearly already decided to surrender before any contact with the police."  710 So. 2d at 1319.  The petitioner has not challenged this finding, which therefore must stand under Section 2254(d).  The petitioner's claim expressly depends on his having been induced to surrender, and the established fact that he was *not* induced to surrender necessarily dooms his claim.

With respect to Ellzey, the petitioner does not identify what the state did or said, who said or did it or when, or how it served to "coerce" her into testifying before the grand jury, and he cites no part of the record to support the claim.  Nor does the petitioner identify any relevant legal principle or analysis, much less attempt to apply it to his case. That spare treatment of itself would be grounds to reject the claim, but the Court has reviewed the petitioner's brief on direct appeal in an effort to flesh out his position.

According to that brief, Mobile police:  falsely told Ellzey that no one had been executed in Alabama in 20 years; threatened her with prosecution if she did not cooperate with their investigation; and forced her to view Gerald Paravicini's body for an extended

period.  The brief concludes that this conduct rendered Ellzey's statement coerced, such that her subsequent grand jury testimony should have been excluded as fruit of the poisonous tree.  (Vol. V, P-2 at 114-18).

The petitioner has no standing to complain about any violation of Ellzey's rights; therefore, his claim can succeed only if the police conduct violated his own rights. *Wilcox v. Ford*, 813 F.2d 1140, 1147-48 & n. 13 (11th Cir. 1987).  That conduct was much milder than the petitioner suggests.

First, the police did not threaten Ellzey with prosecution if she did not provide a statement; rather, she testified that they said, "[D]o you know that if while he's out there now, and he hurts somebody, or he kills somebody, that you can be held responsible, too, *if you don't tell us where he is* [?]"  (Vol. VIII, P-1 at OR-92(emphasis added)).  Second, the police did not force Ellzey to view Gerald's body; rather, she testified that they placed her in a police car nearby, and the wind at some point blew off the tarp which had been covering the body.  (*Id*. at 87).  Of course, nothing prevented Ellzey from closing or averting her eyes.  Nor is there a shred of evidence that either of these circumstances influenced Ellzey's decision to provide a statement.  Finally, the representation concerning a lack of recent Alabama executions occurred *after* Ellzey gave her statement and so could not have affected her decision to provide one.[37]

Even were everything the petitioner claims borne out by the record, "[t]he interrogation methods used by the prosecutors when questioning [Ellzey] fall short of the level of egregiousness necessary to constitute a violation of [the petitioner's] constitutional rights."  *Brown v. Jones*, 255 F.3d 1273, 1281 (11th Cir. 2001).  The standard was set in *Wilcox*, in which it was ruled that officers' tactics of: telling one witness they would "fry his ass" and insinuating they had incriminating fingerprints of

---

[37]Ellzey gave her statement on the morning of the murders, (Vol. II, P-1 at R-447-48, 459), and it was not until the next day that she inquired, and was told, about recent Alabama execution history.  (*Id*. at R-450-51).

his; threatening to charge a second witness with murder, threatening to lynch him, threatening to put words in his mouth, and telling him he was headed for eternal damnation; and threatening to send a third witness to the electric chair or see him die in prison, did not violate the defendant's due process rights. 813 F.2d at 1147-48. In light of *Wilcox*, the petitioner can have no viable claim that the alleged police misconduct, even if it had occurred and even if it had affected Ellzey's decision to give a statement, was sufficiently egregious to violate his constitutional rights. The petitioner does not argue otherwise.

Because the petitioner's only argument for challenging Ellzey's grand jury testimony is that it is fruit of the poisonous tree, and because the tree patently is benign, his constitutional claim concerning her grand jury testimony necessarily fails.

As with his challenge to the photographs, the petitioner raised the substantive claim on direct appeal but did not raise ineffective assistance in his Rule 32 proceedings, and it is too late to cure the omission. Therefore, this claim must be dismissed as procedurally defaulted. Even were the Court to reach the merits, the constitutionality of the state's conduct would be fatal to his ineffective assistance claims.

In summary, the state court adjudication that the petitioner was not induced to surrender negates his claim that he was. His claim concerning Ellzey's coerced grand jury testimony has been abandoned by his failure to support it, is based on facts that do not exist and/or that do not matter, and is in any event legally insufficient. The petitioner's claims of ineffective assistance are procedurally defaulted and, at any rate, the constitutionality of the police conduct demonstrates that counsel did not perform deficiently and that there is no reasonable probability that, but for the conduct, the petitioner would not have been sentenced to death. The petitioner is thus not entitled to relief on this ground.

## X.  Unconstitutional and Improperly Challenged Grand Jury Proceedings.

In April 1992, the grand jury returned the four indictments on which the petitioner was tried.  In May 1992, the prosecutor summoned Ellzey before the grand jury, which was investigating attempted murder charges concerning Mrs. Paravicini and Billedeaua.  The petitioner argues that this represented an unconstitutional attempt to obtain secret discovery after the indictments on which he was tried were returned, and that trial counsel were ineffective in failing to challenge this abuse of the grand jury process.  (Doc. 11 at 78).

"[P]rosecutorial agents may not use the Grand Jury for the primary purpose of strengthening [the state's] case on a pending indictment or as a substitute for discovery," *United States v. Beasley*, 550 F.2d 261, 266 (5th Cir. 1977), but they "may continue an investigation from which information relevant to a pending prosecution may be an incidental benefit."  *United States v. Alred*, 144 F.3d 1405, 1413 (11th Cir. 1998) (internal quotes omitted).  Because the courts indulge the "presumption that the government acted within the scope of its authority," the burden falls to the petitioner to show that the state's primary purpose for the grand jury appearance was an improper one.  *Id*. at 1414.

The petitioner's four-sentence argument on this claim fails even to identify the evidence on which he would rely to show the state's improper purpose and so fails to meet his burden.  Moreover, the petitioner presented this claim on direct appeal, and the Supreme Court adjudicated it on its merits, finding that "the district attorney did not call Ellzey before the May grand jury for the sole or dominant purpose of obtaining discovery and impeachment evidence for use during [the petitioner's] capital murder trial."  710 So. 2d at 1355.  Because the petitioner does not challenge this finding, it is binding on this Court under Section 2254(d), negating his claim.

Even were there some impropriety in the state's conduct, the petitioner's claim would fail.  "We hold that, as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."  *Bank of Novia Scotia v. United States*, 487 U.S. 250, 254 (1988).  The

petitioner has not asked for dismissal of the indictment, but he acknowledges that he must show prejudice in order to obtain relief of any sort. (Doc. 11 at 78). It exists, he says, because Ellzey's grand jury testimony "prejudiced the presentation of [his] defense at trial." (*Id.*). He does not explain this conclusory statement, and a careful review of the state's cross-examination of Ellzey refutes it.

The state's first effort was an unsuccessful bid to show the falsity of Ellzey's trial testimony that she and the petitioner were not arguing on the telephone, but the grand jury transcript actually paralleled her testimony that, while she was upset with him, they were not arguing. (Vol. II, P-1 at R-444, 461-63). The prosecution next used the grand jury transcript to show that, contrary to Ellzey's trial testimony that the petitioner had never struck her, he had in fact slapped her, pulled her hair, and broken her glasses. (*Id.* at R-463-64). Finally, the prosecution used the grand jury transcript to confirm that the petitioner on the telephone sounded calm and had not mentioned seeing monsters — an account perfectly consistent with her trial testimony. (*Id.* at R-467-69). Thus, the sum effect of the state's use of Ellzey's grand jury testimony was to show that the petitioner had a short history of minor violence, and while the prosecutor mentioned this history in his closing, he did so only in passing. (*Id.* at R-560). This tepid record is altogether insufficient to support a conclusion that the petitioner was prejudiced by Ellzey's appearance before the grand jury. The state court reached the same conclusion, 710 So.2d at 1295, and the petitioner has not attempted to meet his burden of challenging it. Thus, it is binding on this Court under Section 2254(d).

As with certain challenges under Part IX, the petitioner raised this claim as a constitutional challenge on direct appeal, but he did not raise ineffective assistance in the state Rule 32 proceedings.[38] Because his failure to exhaust has hardened into a

---

[38]The only grand jury claim the petitioner raised in the Rule 32 proceedings concerned trial counsel's failure to obtain the transcripts and prosecutor's notes, (Vol. IX, P-19 at 96-97), a claim he has not pursued in this Court.

procedural default, as to which he asserts neither cause and prejudice nor actual innocence, this claim must be dismissed.  Even were the Court to reach the merits, the constitutionality of the state's conduct and the absence of prejudice to the petitioner would be fatal to his ineffective assistance claim.

In summary, the petitioner has failed to show either that the state abused the grand jury process or that he was prejudiced thereby, and the unchallenged state court rulings to that effect preclude his claim.  His ineffective assistance claim is procedurally barred and is meritless in any event.  The petitioner is thus not entitled to relief on this ground.

## XI.  Unconstitutional and Ineffectively Challenged Compensation Scheme.

In perfunctory fashion, the petitioner argues that one reason his trial counsel were ineffective is because Alabama's compensation scheme for appointed lawyers in capital cases is inadequate.  (Doc. 11 at 74).  The short answer to this assertion is that, as discussed above, trial counsel were not ineffective.  Nor has the petitioner articulated, much less supported, a causal connection between Alabama's compensation scheme and any ineffective assistance of his counsel.  On the contrary, he asserts merely that the scheme can "*potentially* caus[e] *constraints* on trial counsel's *investigation*," (*id*. at 75 (emphasis added)), not that the scheme *did* cause *ineffectiveness* in *his* counsel's *representation*.  Finally, the petitioner does not demonstrate, or even explain, how Alabama's compensation scheme could be unconstitutional, and he concedes the argument has been repeatedly rejected.

The federal petition is ambiguous as to whether the petitioner alleges that trial counsel were ineffective in not challenging the compensation scheme.  While the argument section plainly does not so allege, (Doc. 11 at 74-75), elsewhere the petition complains that "[t]rial counsel completely failed to challenge the inadequate compensation of appointed counsel, even though on this issue the applicable law continues to evolve."  (*Id*. at 23).

-66-

Any ineffective assistance claim, assuming it has been properly raised, fares no better than the substantive claim.  As noted, the petitioner presents no authority for the proposition that Alabama's compensation scheme is unconstitutional.  Even if the law in this area is evolving,[39] the Eleventh Circuit "ha[s] held many times that reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop."  *Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) (internal quotes omitted).  This and like cases constitute "a wall of binding precedent that shuts out any contention that an attorney's failure to anticipate a change in the law constitutes ineffective assistance of counsel."  *United States v. Ardley*, 273 F.3d 991, 993 (11th Cir. 2001) (Carnes, J., concurring).

The petitioner raised this claim in state court, and the Court of Criminal Appeals adjudicated it on its merits.  The court concluded that the claim was procedurally barred and that, in the alternative, it was legally meritless because Alabama's compensation scheme is not unconstitutional.  (Vol. IX, P-26 at 35).  The petitioner argues that the procedural bar ruling was erroneous, (Doc. 11 at 74), but the Court need not address that contention because the petitioner does not challenge the court's alternative ruling on the merits.  That ruling therefore must stand under Section 2254(d).

In summary, the petitioner has failed to show that Alabama's compensation scheme is unconstitutional or that any such defect caused his counsel to perform deficiently.  Because of these deficiencies, his ineffective assistance claim also fails.  The petitioner is thus not entitled to relief on this ground.

## XII.  Adoption of Proposed Rule 32 Order.

The state presented the trial court a proposed 47-page order denying the petitioner

---

[39]For this proposition, the petitioner relies on a newspaper article reporting then-Justice O'Connor's comment (in 2001, nine years after his trial) that it may be time to consider standards for adequate compensation.  (Vol. IX, P-19 at 91-92).

all relief.  (Vol. VIII, P-17).  The petitioner claims that the proposed order "contain[ed] a number of patent flaws," (Doc. 11 at 4, 46), but he identifies only one: a statement that the petitioner bore the "burden of proving an insanity defense based on intoxication."  (*Id.* at 46).  The trial court signed the proposed order without change, appending to it a brief order stating in pertinent part as follows:

> The ordered [sic] prepared by the State of Alabama accurately identifies the facts found by the Court and correctly states the Court's conclusions of law.  That order is executed herewith and constitutes the findings of fact, the conclusions of law and the order of this Court.

(Vol. VIII, P-17 at 1).  The petitioner argues that the trial court's "wholesale adoption" of the state's proposed order violated his due process rights.  (Doc. 11 at 79).

After this order was entered, the petitioner appealed.  In his initial brief, he noted in his factual summary that the trial court had signed the proposed order, "warts and all."  (Vol. IX, P-19 at 13-14).  After leaving the matter for some 83 pages, the petitioner stated as follows in the final paragraph of his conclusion:

> Rule 32 was designed to correct just this kind of error [ineffective assistance].  But rather than adhere to well-established federal and Alabama law, the trial court adopted without change an order drafted by the State that, astonishingly, both the trial court and the State recognized contained profound errors.  These results are inconsistent with fundamental fairness and due process and warrant correction by this Court.

(*Id.* at 97-98).  The Court of Criminal Appeals did not address this statement.

"In order to be exhausted, a federal claim must be fairly presented to the state courts."  *McNair*, 416 F.3d at 1302.  A petitioner does not fairly present a claim to the state courts when, for example, he "note[s] the allegations in his introductory and conclusory portions of his state appellate brief" but "d[oes] not raise it as a discrete claim," at least if the appellate court does not review its merits.  *Jones v. Campbell*, 436 F.3d 1285, 1304 (11th Cir. 2006).  That scenario accurately describes the present one.

It is true that the quoted language states that the trial court violated "federal and Alabama law," and it is true that the Supreme Court has suggested that a petitioner can

raise a federal issue in state court "by simply labeling the claim 'federal,'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004), but the Eleventh Circuit has cautioned that this dicta must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary."  *McNair*, 416 F.3d at 1302 (internal quotes omitted).  Thus, "[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record." *Id*. at 1303 (internal quotes omitted).

That is precisely what the petitioner scattered here.  In his statement of facts, the petitioner noted that the trial court had adopted an order prepared by the state that included alleged legal errors, but with no suggestion that this constituted anything other than clumsiness.  The petitioner then set forth a battery of legal claims covering over 80 pages — helpfully identified by headings in text and repeated in a table of contents — that did not include any claim concerning the state-drafted order.  Finally, labeled as part of a "conclusion" rather than as a "claim," the petitioner dashed off a flip reference to due process in one sentence and federal law in another.  Indeed, by employing the plural form, "[t]hese results," the petitioner affirmatively indicated that the matters "inconsistent with fundamental fairness and due process" were the multiple decisions of counsel addressed in the preceding paragraph.  Not surprisingly, the Court of Criminal Appeals did not detect a claim in this haystack.

Because the petitioner failed to fairly present this claim to the state court, he has not exhausted it.  The only way he could now exhaust the claim is by way of a successive petition, and such an avenue is unavailable when the court had jurisdiction and the petitioner cannot show good cause why, when the first petition was pursued, the claim was unknown and could not have been ascertained through reasonable diligence.  Ala. R. Crim. P. 32.2(b).  Because the petitioner *did* know of this claim at the time of his first petition, he cannot bring a successive petition.  *McNair*, 416 F.3d at 130 4 n.11.  Thus, the

claim is procedurally defaulted and, given the petitioner's failure to argue either cause and prejudice or actual innocence, due to be dismissed.

Even were the Court to reach the merits, the petitioner cites no authority for the proposition that his due process rights have been violated.  The single federal case he cites does no more than point out the additional burden placed on the Supreme Court when a district court adopts a skeletal order submitted by a litigant.  *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 615 n.13 (1974).

A court's adoption of an order prepared by a litigant cannot violate due process unless the opposing litigant "can demonstrate that the process by which the judge arrived at [such an order] was fundamentally unfair."  *In re: Colony Square Co.*, 819 F.2d 272, 276 (11th Cir. 1987).  Even when the opponent had no opportunity to critique the proposed order before it was entered, no due process violation occurs if there is no evidence that the trial court was "swayed or influenced" by the proposed order and if the opponent "had ample opportunity to present its arguments" on judicial review of the adopted order and thereby "correct any errors in the procedure used."  *Id.* at 276-77.  Under such circumstances, the opponent has not been denied a meaningful opportunity to be heard.  *Id.* at 277.  Both these circumstances are present here.

First, there is no evidence that the trial court was swayed or influenced by the proposed order.  On the contrary, the judge's extensive questioning of counsel at oral argument following the close of evidence and briefing — but before he had read the proposed order — reflects his profound skepticism about the petitioner's position.  (Vol. VIII, P-16).  Moreover, his order adopting the proposed order makes unmistakably clear that the findings and conclusions expressed in the adopted order are his.  Second, the petitioner's federal habeas corpus petition has provided the Court the opportunity to review the order for reversible error — which, incidentally, it has not found.

It is doubtful that the *Colony Square* analysis is even implicated in this case.  As that decision noted, due process concerns itself with whether the petitioner has had a

meaningful opportunity to be heard, and *Colony Square* considered only how to analyze that question when the opponent was not given the opportunity to respond to the proposed order before its adoption.  819 F.2d at 276.  Here, the petitioner was served with a copy of the proposed order, and he submitted a detailed, 26-page objection to the order almost three months before it was signed.  (Vol. XI, P-36 at OR-416-35).  The petitioner has not offered to explain how this procedure could have denied him a meaningful opportunity to be heard.

In summary, the claim that the petitioner's due process rights were violated by the Rule 32 court's adoption of the state's proposed order is procedurally defaulted, and no violation of due process occurred in any event.  The petitioner is thus not entitled to relief on this ground.


## XIII.  Mental Retardation.

On June 20, 2002, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), which "conclude[d] that such punishment [the "execution of mentally retarded individuals"] is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender."  *Id*. at 321 (internal quotes omitted).  *Atkins* abrogated *Penry v. Lynaugh*, 492 U.S. 302 (1989), which had rejected a categorical constitutional ban on such executions.  *Id*. at 340.  The petitioner argues that, in light of *Atkins*, he is entitled to develop additional evidence of mental retardation and to make a presentation at an evidentiary hearing.  (Doc. 11 at 58).

The threshold issue is whether the petitioner exhausted this issue in the Alabama courts.  *Atkins* was released after the petitioner's initial Rule 32 appellate brief was filed, and the petitioner sought relief based on *Atkins* in his next subsequent filing — his reply brief, filed on or about July 25, 2002.  (Vol. IX, P-21 at 5 n.3).  Soon thereafter, the Court of Criminal Appeals postponed oral argument and ordered the parties to submit

supplemental briefing addressing the effect of *Ring v. Arizona*, 536 U.S. 584 (2002).  The petitioner requested from the appellate court, and received, permission to expand the supplemental briefing to include the effect of *Atkins*.  (Doc. 11 at 47; Vol. X, P-27 at 75; *id.*, P-28 at 5).  Thereafter, the parties submitted multiple competing briefs addressing these two cases.  (Vol. IX, P-22 to -25).  The petitioner re-asserted his *Atkins* claim on application for rehearing.  (*Id.*, P-27 at 6-13; *id.*, P-28 at 5-16).

        "In order to be exhausted, a federal claim must be fairly presented to the state courts."  *McNair*, 416 F.3d at 1302.   Whether an issue not raised in the initial appellate brief on collateral review may nevertheless be considered fairly presented depends on state law.  *Compare Atwater v. Crosby*, 451 F.3d 799, 810 (11th Cir. 2006) (issue first raised in appellate reply brief was not exhausted, given state law that matters first raised in a reply brief cannot be considered) *with Ogle v. Estelle*, 592 F.2d 1264, 1267-68 (5th Cir. 1979) (issue first raised in connection with appellate motion for rehearing was exhausted, given that the issue arose during appeal, the issue was fully briefed by both sides, and state law did not preclude consideration of such issues in the appellate court's discretion).

        "[A]n appellant may not raise a new issue for the first time in a reply brief."  *Murray v. State*, 922 So. 2d 961, 963 n.1 (Ala. Crim. App. 2005) (internal quotes omitted) (Rule 32 appeal).  This is a general rule, however, not an absolute prohibition.  *E.g., Town of Pike Road v. City of Montgomery*, 2006 WL 2522711 at *1 (Ala. 2006) ("As a general rule, the Court does not consider matters raised for the first time in an application for rehearing.").  Thus, the Court in  *Blackmon v. State*, 2006 WL 2458641 (Ala. Crim. App. 2006), could state that, "[b]ecause of the unique facts presented in this case we allowed newly retained counsel the rare opportunity of filing a brief on rehearing that raised new issues that had not been previously presented to this Court in Blackmon's original brief."  *Id*. at *1.

        This case follows *Ogle*.  First, the decision in *Atkins* — which abrogated the

contrary decision in *Penry* — was released after the petitioner's initial appellate brief was filed, and so could not have been argued in that brief. Second, state law does not absolutely forbid an appellate court from considering an issue first raised after the initial brief. Third, the *Atkins* issue was fully briefed, with two memoranda submitted by each side. This case is in fact stronger than *Ogle*, because here it is clear that the appellate court, by agreeing to the petitioner's request to address the issue, affirmatively invited presentation of the *Atkins* issue past the normal briefing schedule.[40] The *Atkins* issue was thus fairly presented to the state appellate court, and the petitioner has exhausted the claim. The respondent does not argue otherwise.[41]

The respondent does, however, raise a number of contentions in opposition to the petitioner's *Atkins* claim. First, it argues that the Court of Criminal Appeals adjudicated the claim on its merits, thus implicating Section 2254(d). (Doc. 16 at 17-18). As noted in Part IV, however, the record must provide some basis for concluding that the state court adjudicated a claim on its merits, and this record provides no such indication. Not only does the appellate opinion fail to address the *Atkins* claim expressly, it neither

---

[40]The Court of Criminal Appeals followed a similar procedure in other cases after *Ring* was decided. *See Turner v. State*, 924 So. 2d 737, 784 n.12 (Ala. Crim. App. 2002) (court sua sponte requested special, supplemental briefing on *Ring*); *Duke v. State*, 889 So. 2d 1, 41 (Ala. Crim. App. 2002) (after issuing its decision on appeal, court requested briefing on *Ring*), *vacated on other grounds*, 544 U.S. 901 (2005).

[41]As discussed *infra* in text, the state court did not address the *Atkins* claim. This is irrelevant to exhaustion. "'[I]t is too obvious to merit extended discussion that whether the exhaustion requirement of 28 USC s 2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court, and indeed, in this case vigorously opposed in the State's brief.'" *Ogle*, 592 F.2d at 1268 n.8 (quoting *Smith v. Digmon*, 434 U.S. 332, 333 (1978)).

Because the claim is not exhausted, it is not procedurally defaulted for failure to exhaust. All other potential forms of procedural default have been waived by the respondent's failure to articulate such a defense. *McNair*, 416 F.3d at 1306 & n.14.

acknowledges its existence nor sweepingly disposes of all claims not expressly addressed. On the contrary, the appellate court concluded only that the "the Circuit Court of Mobile County correctly denied Williams relief on all of his claims." (Vol. IX, P-26 at 39). The *Atkins* claim, however, was not raised before the trial court, and the trial court did not deny relief on that claim. Thus, the appellate opinion affirmatively negates any suggestion that the court adjudicated the merits of the *Atkins* claim.

Second, the respondent argues that *Atkins* does not apply retroactively to cases already on collateral review when the decision was handed down. (Doc. 16 at 18, 19). The respondent offers no authority or explanation for its position, which is plainly incorrect. "There is no question that the rule recently announced by the Supreme Court in *Atkins* ... is a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court that was previously unavailable." *In re: Holladay*, 331 F.3d 1169, 1172 (11th Cir. 2003); *accord In re: Hicks*, 375 F.3d 1237, 1239 (11th Cir. 2004).

Third, the respondent argues that Section 2254(e)(2) precludes the petitioner from receiving an evidentiary hearing on the *Atkins* claim. (Doc. 16 at 19). That subsection, however, applies only when the petitioner "failed to develop the factual basis of a claim in State court proceedings," and no such failure occurs unless the petitioner displayed a "lack of diligence, or some greater fault." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence ... depends on whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court ...." *Id*. at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id*. at 437.

The petitioner meets the *Williams* standard. First, he placed some evidence of subnormal mental functioning in the record, which was a reasonable effort in light of the information available (that it might help shape a non-statutory mitigating circumstance but could not preclude imposition of the death penalty). Second, promptly after *Atkins* made it unconstitutional to execute the mentally retarded, he requested the Court of

Criminal Appeals to "remand in order to develop additional evidence to determine whether he satisfied the *Atkins* threshold," (Vol. IX, P-21 at 5 n.3), and he repeated this request on multiple occasions, (*id.*, P-22 at 42; *id.*, P-24 at 26; Vol. X, P-27 at 12-13, 79; *id.*, P-28 at 8, 15-16), thus fulfilling his obligation to seek an evidentiary hearing in state court. *See also Walker v. True*, 399 F.3d 315, 327 (4th Cir. 2005) ("Because *Atkins* was decided after Walker's conviction became final, neither he nor his counsel can be faulted for failure to develop the factual basis of that claim."); *Valle v. Secretary, Department of Corrections*, 459 F.3d 1206, 1216 (11th Cir. 2006) ("Because [the petitioner] attempted to secure an evidentiary hearing in the state courts, [his] failure to develop a factual basis for his claim in state court does not preclude this Court from granting an evidentiary hearing.").

The respondent ignores the "failed to develop" language of Section 2254(e)(2) and the jurisprudence surrounding it, focusing instead on the requirement of subparagraph (e)(2)(B) that the petitioner show facts establishing by clear and convincing evidence that, but for constitutional error, the outcome would have been different. (Doc. 16 at 19). However, "[i]f there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements." *Williams v. Taylor*, 529 U.S. at 437. Subsection (e)(2)(B) thus does not apply.

Finally, the respondent suggests that no discovery or evidentiary hearing is appropriate because the existing record demonstrates that the petitioner is not mentally retarded. (Doc. 16 at 19-25). This argument depends in large measure on Alabama's requirement of an IQ no greater than 70 and the petitioner's two full-scale IQ scores reflected in the record — 74 as a child and 79 in 1992, when tested by Dr. McClaren.

Assuming without deciding that no person with an IQ above 70 can be declared mentally retarded under *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002), and assuming

without deciding that such a limitation comports with *Atkins* — which the petitioner disputes, (Doc. 11 at 55) — the respondent has not explained how, on this record, the two record IQ scores negate mental retardation. First, of course, there may be additional historical IQ scores, as the petitioner hints. (Doc. 20 at 4). Second, there may be reasons why the record IQ scores are unreliable, including without limitation problems with the testing methodology and the so-called "Flynn effect," which the petitioner maintains has currency here. (Doc. 11 at 49-51). *See generally Walker v. True*, 399 F.3d at 322 (describing the Flynn effect and instructing the district court on remand to consider the persuasiveness of the petitioner's evidence of it).

The respondent also attacks the petitioner's ability to establish the other elements of mental retardation under *Perkins*: significant or substantial deficits in adaptive behavior, and onset of the problems manifested before age 18. *See* 851 So. 2d at 456. The Court cannot agree with the respondent's unsupported contention that the petitioner's conduct on the day of the murders, either alone or in combination with his brief marriage and his employment as a carpet installer, negates the existence of significant or substantial deficits in adaptive behavior. (Doc. 16 at 21-22). Nor, contrary to the respondent's position, (*id*. at 23, 25), is the present limited record of adaptive deficits and date of onset significant, given the inapplicability of Section 2254(e)(2).

The petitioner requests an opportunity to develop evidence of his mental retardation and to present his case for mental retardation at an evidentiary hearing. Before proceeding to such issues, it is necessary to determine whether, given the procedural posture of this case, this Court or the state courts should make the mental retardation determination. The Court will by separate order establish a briefing schedule concerning this issue.

## CONCLUSION

For the reasons set forth above, all of the petitioner's claims, other than his *Atkins*

claim, are **denied**.  The *Atkins* claim will be resolved by later order.[42]

DONE and ORDERED this 11 day of April, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[42]Because this order does not adjudicate all of the petitioner's claims, it is not presently appealable.  Fed. R. Civ. P. 54(b).